COMMONWEALTH OF KENTUCKY, Appellant,

v.

Edward Green JAMESON, Appellee.

No. 2004-SC-000983-DG.

Supreme Court of Kentucky.

Nov. 22, 2006.

Rehearing Denied March 22, 2007.

Christopher Shea Nickell, Assistant McCracken County Attorney, David L. Kelly, Jason M. Lacy, Denton & Keuler, LLP, Paducah, Gregory D. Stumbo, Attorney General of Kentucky, Frankfort, Scott D. Bergthold, Chattanooga, TN, Counsel for Appellant.

Mark P. Bryant, Emily Ward Roark, Bryant & Kautz, Paducah, Bradley J. Shafer, Shafer & Associates, Lansing, MI, Counsel for Appellee.

Christopher S. Bumside, Griffin Terry Sumner, Frost, Brown & Todd, LLC, Louisville, Counsel for Reclaim Our Culture Kentuckiana, LLC (Amicus Curiae).

Brent L. Caldwell, McBrayer, McGinnis, Leslie & Kirkland, PLLC, Lexington, Winston E. King, N. Scott Lilly, William P. O'Brien, Louisville/Jefferson County Metro Government, Assistant County Attorney, Louisville, Leslye M. Bowman, Director of Litigation, Lexington–Fayette Urban County Government, Department of Law, Lexington, Counsel for International Municipal Lawyers Association, Kentucky Association of Counties, Kentucky League of Cities, the Louisville/Jefferson County Metro Government, & the Lexington–Fayette Urban County Government (Amicus Curiae).

Opinion of the Court by Justice SCOTT.

On April 24, 2000, the McCracken County Fiscal Court adopted and published Ordinance No.2000-4, "An Ordinance Providing Regulation of Sexually Oriented Businesses and Their Employees." The ordinance provides, in pertinent part, that employees (i.e. nude dancers) of sexually oriented businesses wear the *de minimis* covering of "pasties" and a "G-string,"[1] and that no sexually oriented businesses remain open at any time between 1 a.m. and 6 a.m.[2] The ordinance also prohibits entertainers and employees of such a business from having any physical contact with a patron during any performance.[3] Any person who violates the provisions of the ordinance would be guilty of a misdemeanor and subject to a fine of not less than one hundred dollars nor more than five hundred dollars, or be imprisoned in the county jail for not more than twelve months or both.[4]

The Preamble to the ordinance states that its purpose is "to promote health, safety, and general welfare of the citizens of [McCracken] County, and to establish reasonable and uniform regulations relating to sexually oriented businesses." By its terms, the ordinance seeks to prevent any negative secondary effects generally associated with sexually oriented busi-

1. McCracken County Ordinance, No.2000-4, Section VII(b).

2. *Id.* at Section IV(e).

3. *Id.* at Section VII(d).

4. *Id.* at Section XI.

nesses, *viz.*, increased crime, lowered property values, and a deleterious effect on surrounding businesses. The ordinance adopts the findings of such adverse secondary effects presented in reports made available to the Fiscal Court, and on findings incorporated in the cases of *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), and *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), as well as on studies from other communities.

Shortly after the passage of the ordinance, Appellee Jameson was cited for operating his adult cabaret [5] (Regina's II) in violation of several of the provisions of the ordinance. Specifically, Jameson was cited for violating the hours of operation requirement, allowing total nudity by dancers, and allowing physical contact between nude dancers and patrons.

Jameson filed a motion in McCracken District Court to declare the ordinance unconstitutional. On October 18, 2001, an evidentiary hearing was held during which several witnesses testified on his behalf. The first witness, Brent Stringer, a dispatcher with the Paducah/McCracken E–911 Communication Services, testified that E–911 had received numerous calls from Regina's II, amounting to approximately two and one-half pages from that location alone, during the 2001 calendar year up to the date of the hearing. Stringer acknowledged, however, that he had received more calls from two nearby non-sexually oriented businesses, *i.e.* nightclubs, during that same period.[6] Stringer also testified that not all criminal investigations are reported on the E–911 call sheets, such as undercover investigations. However, as the Commonwealth points out, Stringer did not testify concerning the number of patrons that visit any of the establishments in a given time period, nor did he testify concerning the total revenues of any of the businesses. Significantly, Stringer did not testify as to whom, if anyone, would typically call 911 to report illicit sexual behavior occurring on the premises of this adult business. It does seem unlikely that one participating in illicit sexual behavior at such a business would call 911 and complain about it. Likewise, Jameson did not attempt to establish that Stringer was an expert in criminology.

Other witnesses, including Melissa Meyer, a day shift manager at The Playhouse, and Joanne Warner, owner of The Playhouse, also testified.[7] Specifically, the women testified about the "rules" in place at The Playhouse, which, as they testified, were in place to keep the patrons and employees safe. Among these were rules against drugs, acts "of any sexual nature,"

5. As the Court of Appeals notes, there is no dispute that Regina's II is an "adult cabaret" as that term is defined in Section II(3) of McCracken County Ordinance No.2000–4: "'Adult Cabaret' means a night club, bar, restaurant, or similar commercial establishment which regularly features: (a) Persons who appear in a state of nudity or seminude; or (b) Live performance which are [sic] characterized by the exposure of 'specified anatomical areas' or by 'specified sexual activities'; or (c) Films, motion pictures, video cassettes, slides or other photographic reproductions which are characterized by the depiction or description of 'specified anatomical areas' or 'specified anatomical areas.'"

6. Jameson's counsel subpoenaed the call logs relating to the non-sexually oriented businesses in an attempt to discredit the findings of the fiscal court upon which the ordinance was founded.

7. Joanne Warner was also cited for misdemeanor violations of the ordinance for activities occurring at The Playhouse, another sexually oriented business located in McCracken County.

prostitution, and the requirement that "everything is sanitized." Warner also emphasized that her establishment had a rule prohibiting patron-dancer touching. Although Warner testified that such rules were in place at The Playhouse, she acknowledged she had recently called the police to report a man engaging in indecent exposure on the premises.

Warner also testified that although she had heard of incidents of sexual acts between patrons and dancers at other clubs, she insisted the rules at The Playhouse specifically prohibited such acts. At no point, though, did Warner or Meyer testify that requiring dancers to wear pasties and a G-string would not further the local government's interest in preventing illicit sexual conduct between patrons and dancers. Moreover, Jameson did not offer similar evidence of "self-regulation" at Regina's II.

Finally, a local realtor, George Wiley, testified via deposition as to several commercial real estate transactions that he had been involved with on the "south side of Paducah"[8] over the previous several years. Wiley opined that the value of "south side" real estate had "increased tremendously" over the past ten to fifteen years based on "what it's selling for now" and "the fact that it wasn't selling" in the time period prior to the previous fifteen years. However, he also admitted that much of this increase in general was due to the recent presence of a Wal-Mart in the area.

On May 31, 2002, the McCracken District Court, having conducted several evidentiary hearings and having heard the arguments of counsel, denied Jameson's motion to declare the ordinance unconstitutional. Applying the United States Supreme Court's holding in *Renton, supra*, as well as Kentucky Court of Appeals' holding in *Restaurant Ventures, LLC v. Lexington–Fayette Urban County Government*, 60 S.W.3d 572 (Ky.App.2001), the court found that McCracken County was entitled to rely upon the studies it compiled and cited concerning the negative secondary effects of sexually oriented businesses. The court also concluded that Jameson supplied no authority demonstrating that the Kentucky Constitution affords greater protection for the nude dancing activities at Regina's II, and therefore rejected the state constitutional claims.[9]

On April 9, 2003, the McCracken Circuit Court affirmed the district court, noting that McCracken County did not need to "conduct new studies or produce evidence independent of that already generated by other municipalities to demonstrate the problem of secondary effects" stemming from activities at sexually oriented businesses. Additionally, the circuit court concluded that whatever evidence the municipality relies upon, that evidence is reasonably believed to be relevant to the problem that the municipality addresses. The court further found that the ordinance was not vague or overbroad in its application, that it was not arbitrary or discriminatory in light of federal or Kentucky constitutional standards, and that the administrative inspection provision imposed on Regina's II fell under the warrantless search exception to the Fourth

---

8. The "south side of Paducah" is an undefined geographical area in which Regina's II, as well as several other non-sexually oriented businesses, i.e. nightclubs, and other businesses and residences are located.

9. Those who have read and are familiar with the Debates of the 1890 Kentucky Constitutional Convention could only imagine the humorous confrontation which would have occurred had these rights been asserted at the convention.

Amendment of the United States Constitution in relation to "closely regulated" businesses.

Jameson then appealed to the Kentucky Court of Appeals, and on August 6, 2004, that court affirmed in part, vacated in part, and remanded the case for further proceedings. In its opinion, the Court of Appeals noted that "as between totally nude exotic dancing and exotic dancing that is accompanied by pasties and G-strings, we hold that any muting of the erotic message that occurs by prohibiting the totally nude exotic dancing is *de minimis.*" Slip Op. at 18. It also acknowledged that "when enacting ordinances aimed at combating the negative, secondary effects associated with sexually-oriented businesses, cities are entitled to rely on studies from other municipalities and even prior court precedents which tend to establish the link between sexually-oriented businesses and those negative, secondary effects." Slip Op. at 21 (citing *City of Erie v. Pap's A.M.*, 529 U.S. 277, 296–97, 120 S.Ct. 1382, 1395, 146 L.Ed.2d 265 (2000)).

However, the Court of Appeals found that Jameson's "unrebutted" evidence before the district court tended to "cast doubt" on the fiscal court's pre-enactment justification for Section VII(b)[10] of the ordinance. In vacating the ruling of the circuit court, the Court of Appeals, citing *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) held that "as *Alameda Books* makes clear, if a party challenging

the regulation casts doubt on the city's pre-enactment rationale, the burden shifts back to the city to proffer supplemental evidence justifying the regulation." Slip Op. at 22. The court also relied on *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, Florida*, 337 F.3d 1251, 1264–65 (11th Cir.2003), wherein the Eleventh Circuit noted that "[t]he significance of *Alameda Books* is that it clarifies how the court is to interpret the third step of the *Renton* analysis as well as the second prong of the *O'Brien* test."[11] The Court of Appeals thus remanded the case back to the McCracken District Court for an evidentiary hearing "to determine whether the fiscal court can proffer supplementary evidence indicating that Section VII(b)'s ban on totally nude dancing furthers a substantial governmental interest *in McCracken County* without unreasonably limiting alternative avenues of communication." Slip Op. at 24 (citing *Peek-A-Boo Lounge*, 337 F.3d at 1273) (emphasis in original).

It is from this ruling that the Commonwealth appeals to this Court. Accordingly, the only issue before this Court is whether the Court of Appeals erred as a matter of law in concluding that Appellee Jameson provided evidence sufficient to cast "direct doubt" on the rationale proffered by the McCracken Fiscal Court for Ordinance No.2000–4 in order to shift the burden to the municipality to supplement the record with evidence renewing support for its ra-

---

**10.** Section VII(b) provides: "No person shall appear nude or in a state of nudity while engaged in any live performance on the premises of any sexually oriented business."

**11.** The Court of Appeals is referring to the second prong of the four-prong test set forth in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), which provides that "a government regulation is sufficiently justified (1) if it is within the consti-

tutional power of the Government; (2) if it furthers an important or substantial governmental interest; (3) if the governmental interest is unrelated to the suppression of free expression; and (4) if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377, 88 S.Ct. at 1679. A detailed discussion of *O'Brien* follows in the Analysis portion of this opinion.

tionale in enacting the ordinance. For the reasons set forth herein, we find that the Court of Appeals erred as a matter of law, and thus we reverse the Court of Appeals and reinstate the judgment of the district court.

## ANALYSIS

### A. Standard of Review.

■ Our review of this matter requires this Court to interpret an ordinance adopted by the McCracken County Fiscal Court as it regulates sexually oriented businesses in that county. Since this review involves the construction and application of Ordinance No.2000–4, it is thus a matter of law, and "may be reviewed *de novo.*" *Bob Hook Chevrolet Isuzu, Inc. v. Com., Transp. Cabinet,* 983 S.W.2d 488, 490 (Ky.1998).

### B. History and development of First Amendment jurisprudence as it relates to sexually oriented businesses.

The case at bar involves an ordinance directed at preventing the negative secondary effects generally associated with sexually oriented businesses. Specifically, McCracken County Fiscal Court adopted Ordinance No.2000–4 in an effort to protect the health, safety and welfare of the citizens of McCracken County and to establish "reasonable and uniform regulations relating to sexually oriented businesses." Based in part on United States Supreme Court precedent, rationales offered by various other jurisdictions, and studies conducted in other communities, the ordinance purports to target negative secondary effects without the intent or effect of restricting or denying access by adults to sexually oriented materials or of imposing a limitation or restriction on the content of any communicative materials.

Prior to determining whether or not the Court of Appeals correctly determined that Jameson was successful in casting direct doubt on the rationale or findings of fact proffered by the fiscal court, a thorough analysis of the secondary effects doctrine and First Amendment jurisprudence as it relates to sexually oriented businesses and as developed by the United States Supreme Court is necessary. This task is complicated by the fact that, to date, there have been no clear majority standards formulated for evaluating nudity ordinances given that almost all of the decisions in this area were decided by plurality opinions.

Furthermore, the Supreme Court "has occasionally borrowed specific doctrines developed in one category of case[s] to apply to the other." *Peek–A–Boo Lounge,* 337 F.3d at 1255–56. As will become apparent, the standards that have developed provide only a framework for courts to apply in determining whether a regulation, aimed at preventing identified negative secondary effects, impermissibly encroaches on the expressive message purportedly inherent in erotic dancing. Subsequently, the Supreme Court has found that this manner of "speech" is only marginally protected by the First Amendment to the United States Constitution. *See, e.g., California v. LaRue,* 409 U.S. 109, 118, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972) (Rehnquist, J. majority) (finding that "at least some of the performances to which these regulations address themselves are within the limits of the constitutional protection of freedom of expression"), *overruled on other grounds by 44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996); *Doran v. Salem Inn,* 422 U.S. 922, 932, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (declaring that "although the customary 'barroom' type of nude dancing may involve only the barest minimum of protected expression, we rec-

ognized [in *LaRue*] that this form of entertainment might be entitled to First and Fourteenth Amendment protection in some circumstances"); *Young v. American Mini Theatres,* 427 U.S. 50, 70, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (Stevens, J., plurality) (recognizing that "the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, [yet] it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than that interest in untrammeled political debate"); *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (Rehnquist, C.J., plurality) (stating that "nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so"); *City of Erie v. Pap's A.M.,* 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (O'Connor, J., plurality) (holding that "[b]eing in a 'state of nudity' is not an inherently expressive condition.... [H]owever, nude dancing of the type at issue here is expressive conduct, although we think that it falls only within the outer ambit of the First Amendment's protection.").

1. *United States v. O'Brien* [12]

In 1966, David Paul O'Brien and several companions burned their Selective Service Registration cards on the steps of the South Boston Courthouse. Upon his arrest, O'Brien acknowledged that he knew he was violating federal law [13] by burning his card, but told the FBI agents that he did so because of his anti-war beliefs. O'Brien did not contest the fact that he destroyed the card and argued to the jury that he did it as a protest and in an attempt to influence others to adopt his anti-war beliefs. He was subsequently tried, convicted and sentenced.

On appeal, the Court of Appeals for the First Circuit held that the law was unconstitutional as they found the law was directed at public rather than private destruction of the certificates and thus "singl[ed] out persons engaged in protests for special treatment." *O'Brien,* 391 U.S. at 370, 88 S.Ct. at 1676. Consequently, the issue was presented to the United States Supreme Court to ultimately decide the constitutionality of the law.

In evaluating O'Brien's claims, the Supreme Court held that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* at 376, 88 S.Ct. at 1678–79. The Court then articulated what has now become the four-part test for evaluating, *inter alia,* regulations affecting sexually oriented businesses:

[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the govern-

---

**12.** 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Although this case does not involve a municipal ordinance regulating public nudity or providing for zoning of specific adult oriented businesses, it is nonetheless the most logical starting point for this discussion as the four-part test developed therein has been utilized in numerous cases involving ordinances regulating sexually oriented businesses.

**13.** 50 U.S.C.App. § 462(b), *amended by* Act of 1965, 79 Stat. 586. When Congress amended the statute in 1965, it added language so that at the time O'Brien burned his certificate, an offense was committed by any person "who forges, alters, knowingly destroys, knowingly mutilates, or in any manner changes any such certificate."

mental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377, 88 S.Ct. at 1679.

### 2. *California v. LaRue*

The existence of First Amendment freedom of expression rights in the context of sexually oriented businesses was first recognized in *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), *overruled on other grounds by 44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). At issue was the constitutionality of several regulations promulgated by the California Department of Alcoholic Beverage Control to prohibit live explicitly sexual entertainment and films in bars and other establishments licensed to dispense liquor by the drink. In upholding the regulations as a valid exercise of the state's power under the Twenty-first Amendment to the United States Constitution, the Court discussed the regulation of differing modes of expression in the context of adult entertainment:

> In *O'Brien* . . . the Court suggested that the extent to which "conduct" was protected by the First Amendment depended on the presence of a "communicative element," and stated: "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express in idea."

*LaRue,* 409 U.S. at 117, 93 S.Ct. at 396–97 (quoting *O'Brien,* 391 U.S. at 376, 88 S.Ct.

at 1678). While the Court agreed that "at least some of the performances to which these regulations address themselves [were] within the limits of the constitutional protection of freedom of expression," they also noted that California did not prohibit these performances across the board. *Id.* at 118, 93 S.Ct. at 397.

Although the determination of constitutionality turned on the Twenty-first Amendment, this case is important for what it says about incidental restrictions on public acts. Significantly, the Court opined that "as the mode of expression moves from the printed page to the commission of public acts that may themselves violate valid penal statutes, the scope of permissible state regulations significantly increases." *Id.* at 117, 93 S.Ct. at 396. Because the state was found to have broad latitude to control the manner in which alcohol was dispensed, any prohibition against performances of a sexual or adult nature in those establishments that were licensed to sell liquor by the drink was constitutional. As mentioned, it was the critical fact that the state did not prohibit such performances "across the board," and only prohibited them in such a way that any prohibition was merely incidental to its ability to regulate the dispensing of alcohol.[14]

### 3. *Young v. American Mini Theatres, Inc.*

In *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), the Supreme Court upheld the constitutionality of a Detroit zoning ordinance, which prohibited the exhibition of "adult" films in theaters not licensed as "adult motion picture theaters." In the

---

14. In *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 516 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), which overruled *LaRue* insofar as it relied on the Twenty-first Amendment, the Court concluded that *"LaRue* would have

[had] precisely the same result if it had placed no reliance on the Twenty-first Amendment . . . [as] the State has ample power to prohibit the sale of alcoholic beverages in inappropriate locations."

plurality opinion, written by Justice Stevens, the Court concluded that "[t]he mere fact that the commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing requirements is not a sufficient reason for invalidating these ordinances." *Id.* at 62, 96 S.Ct. at 2448.

Significantly, the plurality opinion did not rest its decision to uphold the ordinance on the basis of the four-part test of *O'Brien, supra.* However, in a concurring opinion, Justice Powell found that the ordinance had an impact on the communication involved, i.e. the movies themselves, and thus analyzed the constitutionality of the ordinance utilizing the four-part test. Justice Powell thus found that the ordinance was justified because the city clearly had the power to enact the zoning ordinance and the ordinance would further the city's substantial and important interest in having stable residential and commercial neighborhoods free from the deteriorating effects associated with "adult" movie theaters. As for the third and fourth prongs of the test, Justice Powell concluded that because this ordinance was already in existence "for a full decade before adult establishments were brought under it[,]" there was no serious argument that governmental interest in including adult establishments in the ordinance "was wholly unrelated to any suppression of free expression." *Id.* at 80–81, 96 S.Ct. at 2457. "Nor [was] there reason to question that the degree of incidental encroachment upon such expression was the minimum necessary to further the purpose of the ordinance." *Id.* at 81–82, 96 S.Ct. at 2458.

Although Justice Powell and Justice Stevens disagreed on the ultimate reasoning to uphold the constitutionality of the ordinance, both justices agreed that the ordinance was not an attempt to suppress expression. Similarly, Justices Powell and

Stevens found that the ordinance was justified "by the city's interest in preserving the character of its neighborhoods." *Id.* at 71, 96 S.Ct. at 2452 (Stevens, J., plurality). Justice Powell, quoting portions of the plurality opinion, found that "the Council was motivated by its perception that the 'regulated uses,' when concentrated, worked a 'deleterious effect upon the adjacent areas' and could 'contribute to the blighting or downgrading of the surrounding neighborhood.' " *Id.* at 74–75, 96 S.Ct. at 2454 (Powell, J., concurring).

"The record disclosed a factual basis for the Common Council's conclusion that this kind of restriction will have the desired effect." *Id.* at 71, 96 S.Ct. at 2452–53. The factual basis referred to involved the council's determination "that a concentration of 'adult' movie theaters causes the area to deteriorate and become a focus of crime, effects which are not attributable to theaters showing other types of films. It is this secondary effect which these zoning ordinances attempt to avoid, not the dissemination of 'offensive speech.' " *Id.* at 71, n. 34, 96 S.Ct. at 2453 (Stevens, J. plurality). A plurality of the Court thus concluded that "the city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect. Moreover, the city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Id.* at 71, 96 S.Ct. at 2453 (Stevens, J., plurality); *see also id.* at 82, n. 6, 96 S.Ct. at 2458 (Powell, J., concurring) ("We have here merely a decision by the city to treat certain movie theaters differently because they have markedly different effects upon their surroundings.").

Thus, for the first time the Court announced that zoning ordinances regulating sexually oriented businesses could be justified on the basis of preventing the nega-

tive secondary effects associated with those types of businesses. In his concurring opinion, Justice Powell also suggested that a party seeking to invalidate an ordinance for violating the First Amendment could do so by showing that the ordinance encompassed movie theaters which posed no deleterious effect. *Id.* at 82, 96 S.Ct. at 2458 (Powell, J., concurring) ("The case would present a different situation had Detroit brought within the ordinance types of theaters that had not been shown to contribute to the deterioration of surrounding areas.").

### 4. *Schad v. Mount Ephraim*

In *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), the Supreme Court applied a heightened level of scrutiny to a zoning ordinance enacted by the Borough of Mount Ephraim, which prohibited all live entertainment, including non-obscene, nude dancing. The Court found the ordinance unconstitutional in that it "prohibit[ed] a wide range of expression long been held to be within the protection of the First and Fourteenth Amendments." *Id.* at 65, 101 S.Ct. at 2181. Furthermore, no justification was provided "for the exclusion of a broad category of protected expression as one of the permitted commercial uses in the Borough." *Id.* at 67, 101 S.Ct. at 2181–82.

Although at first blush *Young, supra,* would appear to be the controlling case for resolution of the issue in *Schad,* the Court found otherwise.

> [*Young* ] emphasized that the challenged restriction on the location of adult movie theaters imposed a minimal burden on protected speech. The restriction did not affect the number of adult movie theaters that could operate in the city; it merely dispersed them. The Court did not imply that a municipality could ban all adult theaters-much less all live

entertainment or all nude dancing-from its commercial districts citywide. Moreover, it was emphasized in that case that the evidence presented to the Detroit Common Council indicated that the concentration of adult movie theaters in limited areas led to deterioration of surrounding neighborhoods, and it was concluded that the city had justified the incidental burden on First Amendment interests resulting from merely dispersing, but not excluding, adult theaters.

*Schad,* 452 U.S. at 71–72, 101 S.Ct. at 2184 (citations omitted).

In contrast, however, the Court found that "Mount Ephraim [had] not adequately justified its substantial restriction of protected activity." *Id.* (citation omitted). Although Mount Ephraim offered several justifications, it is interesting to note that *none* of those justifications concerned the possibility of negative secondary effects from *allowing all live entertainment.* Mount Ephraim did offer as justification that banning commercial live entertainment would "avoid the problems that may be associated with live entertainment, such as parking, trash, police protection, and medical facilities." *Id.* at 73, 101 S.Ct. at 2185. However, the Court found the distinction inapposite.

> The Borough has presented no evidence, and it is not immediately apparent as a matter of experience, that live entertainment poses problems of this nature more significant than those associated with various permitted uses; nor does it appear that the Borough's zoning authority has arrived at a defensible conclusion that unusual problems are presented by live entertainment.

*Id.* (citation omitted).

Thus, it became clear that the Court was prepared to analyze ordinances regulating adult entertainment under a heightened

level of scrutiny "when a zoning law [broadly] infringes on a protected liberty." *Id.* at 68, 101 S.Ct. at 2182. In *Schad,* the ordinance was overly broad in its restrictions, *i.e.* it was not narrowly drawn, and the justifications offered were inadequate to support a "substantial government interest."

5. *City of Renton v. Playtime Theatres, Inc.*

In *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), the Supreme Court again dealt with a zoning ordinance, although unlike the zoning ordinance at issue in *Young, supra,* the ordinance enacted by Renton sought to concentrate adult movie theaters rather than disperse them. The Court upheld the regulation as a valid governmental response to the "admittedly serious problems" associated with adult movie theaters. *Id.* at 52, 106 S.Ct. at 931.

Although the majority relied heavily upon the analysis and reasoning supplied by *Young,* the Court in *Renton* offered a slightly different framework within which to analyze zoning ordinances. First, the Court determined that the ordinance did not ban adult theaters altogether, but rather provided that those theaters may not be located within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park or school. As such, it was characterized as a time, place and manner regulation.

In the next step of the analysis, the Court had to determine whether the ordinance was "content-neutral," subjecting it to intermediate scrutiny, or "content-based," subjecting it to a heightened level of scrutiny. The *Renton* Court found the ordinance at issue did not necessarily "fit neatly" into either category, but nonetheless concluded that the Renton ordinance was aimed "not at the *content* of the films shown at 'adult motion picture theatres,'

but rather at the *secondary effects* of such theaters on the surrounding community," *id.* at 47, 106 S.Ct. at 929 (emphasis in original), and as such it was consistent with the Court's definition of "content-neutral" speech regulations. Important to this step of the analysis was the Court's reliance on the District Court's finding that "the City Council's *'predominate* concerns' were with the secondary effects of adult theaters, and not with the content of adult films themselves." *Id.* (emphasis in original). The Court further noted that "[t]he ordinance by its terms is designed to prevent crime, protect the city's retail trade, maintain property values, and generally 'protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life,' not to suppress the expression of unpopular views." *Id.* at 49, 106 S.Ct. at 929 (citation omitted).

In the third and final step of the analysis, the Court had to determine whether, as a "content-neutral" regulation, the ordinance was designed "to serve a substantial governmental interest and allow[ed] for reasonable alternative avenues of communication." *Renton,* 475 U.S. at 50, 106 S.Ct. at 930 (citing *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 649, 654, 101 S.Ct. 2559, 2564, 2567, 69 L.Ed.2d 298 (1981)). In finding the ordinance met this standard, the Court opined that "a city's 'interest in attempting to preserve the quality of urban life is one that must be accorded high respect.'" *Id.* (quoting *Young,* 427 U.S. at 71, 96 S.Ct. at 2453 (plurality opinion)).

*Renton* is significant in terms of providing an analytical framework that is not altogether different from the analysis provided in *O'Brien,* at least with respect to

*Renton*'s third prong and *O'Brien*'s second prong. However, perhaps more important is the Court's criticism of the "unnecessarily rigid burden of proof" the Court of Appeals for the Ninth Circuit placed on the city of Renton. *Id.* The Court of Appeals had ruled that the city's justifications for the ordinance were "conclusory and speculative," mainly because the ordinance was enacted "without the benefit of studies specifically relating to 'the particular problems or needs of Renton.'" *Id.* (quoting *Playtime Theaters, Inc. v. City of Renton,* 748 F.2d 527, 537 (9th Cir.1984)). The Supreme Court, however, found that Renton "relied heavily on the experience of, and studies produced by, the city of Seattle ... [where] the adult theater zoning ordinance was aimed at preventing the secondary effects caused by the presence of even one such theater in a given neighborhood." *Id.* (citing *Northend Cinema, Inc. v. Seattle,* 90 Wash.2d 709, 585 P.2d 1153 (Wash.1978)).

As a result, the Court held "that Renton was entitled to rely on the experiences of ... other cities, and in particular on the 'detailed findings' summarized in the Washington Supreme Court's *Northend Cinema* opinion, in enacting its adult theater zoning ordinance." *Id.* at 51, 106 S.Ct. at 931. The Court further stated:

> The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.

*Renton,* 475 U.S at 51–52, 106 S.Ct. at 931. In recognizing that Renton could properly rely on evidence generated by other cities, the Court found the method employed in Renton furthered its substantial interests.

The Court further noted that Renton must be given the opportunity to experiment with solutions to prevent the serious problems associated with sexually oriented businesses. To that end, the Court found the ordinance narrowly drawn to affect only that category of theaters shown to produce the unwanted secondary effects. *Id.* at 52, 106 S.Ct. at 931.

Finally, the Court held that the zoning ordinance allowed for reasonable alternative avenues of communication in that it left "some 520 acres, or more than five percent of the entire land area in Renton, open to use as adult theater sites." *Id.* at 53, 106 S.Ct. at 932. Significantly, the Court found that Renton had not used "'the power to zone as a pretext for suppressing expression.'" *Id.* at 54, 106 S.Ct. at 932 (quoting *Young,* 427 U.S. at 84, 96 S.Ct. at 2459 (Powell, J., concurring)).

6. *Barnes v. Glen Theatre, Inc.*

In *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), the Supreme Court had to determine, for the first time, whether an indecency statute, not unlike that at issue in the case at bar, violated the First Amendment's guarantee of freedom of expression. Indiana's public indecency statute, in effect, required exotic dancers to wear pasties and G-strings. Although a majority of the Court agreed that the statute was constitutional, the Court was unable to agree on a single rationale supporting this conclusion.

In the plurality opinion, written by Chief Justice Rehnquist, in which Justices O'Connor and Kennedy joined, the Court noted that Indiana had not banned nude dancing across the board, but it did prohibit public nudity across the board. In addressing Barnes' contention that the restriction on nude dancing was a valid "time, place or manner" restriction under cases such as *Clark v. Community for*

*Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), the Court recognized that the "time, place or manner" test is significantly similar to the four-part test of *O'Brien, supra.* Moreover, the plurality reiterated that " 'nude dancing is not without its First Amendment protections from official regulation.' " *Barnes,* 501 U.S. at 566, 111 S.Ct. at 2460 (quoting *Schad,* 452 U.S. at 66, 101 S.Ct. at 2181). Thus, the Court applied the rule set forth in *O'Brien, supra.*

In applying *O'Brien,* Chief Justice Rehnquist, writing for the plurality, found that Indiana's statute was justified "despite its incidental limitations on some expressive activity." *Id.* at 567, 111 S.Ct. at 2461. The Court found the statute was within Indiana's constitutional power and furthered the state's substantial governmental interest in "protecting order and morality." *Id.* at 569, 111 S.Ct. at 2462. Furthermore, the Court found Indiana's interests were "unrelated to the suppression of free expression." *Id.* Finally, the Court found that the fourth part of the *O'Brien* test was satisfied as "Indiana's requirements that the dancers wear at least pasties and G-strings [was] modest, and the bare minimum necessary to achieve the State's purpose." *Id.* at 572, 111 S.Ct. at 2463.

Although instructive, the plurality opinion does not constitute the holding of *Barnes.* Here, Justice Souter's concurring opinion provided the narrowest grounds for the judgment of the Court, and thus, his concurrence constitutes the holding according to the rule of *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the results enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.").

Justice Souter agreed with the plurality that the case was properly analyzed under *O'Brien.* However, Justice Souter disagreed with the plurality's determination that the second prong of *O'Brien* was satisfied by the state's substantial interest in protecting order and morality. In contrast, Justice Souter considered the limitations on nude dancing justified by the "State's substantial interest in combating the secondary effects of adult entertainment establishments." *Barnes,* 501 U.S. at 582, 111 S.Ct. at 2468–69. Justice Souter further opined that although the motivation in enacting the statute was not entirely clear, as Indiana has no legislative history, the Court's "appropriate focus is not an empirical enquiry into the actual intent of the enacting legislature, but rather the existence or not of a current governmental interest in the service of which the challenged application of the statute may be constitutional." *Id.* at 582, 111 S.Ct. at 2469. Thus, in Justice Souter's view, "the interest asserted by [the State] in preventing prostitution, sexual assault, and other criminal activity . . . is sufficient under *O'Brien* to justify the State's enforcement of the statute against the type of adult entertainment at issue here." *Id.* at 583, 111 S.Ct. at 2469.

Thus, Justice Souter found *Renton, Young,* and *LaRue, supra,* controlling. Although *Renton* and *Young* involved zoning ordinances, the Court in each of those cases found the states' interest in preventing negative secondary effects associated with sexually oriented businesses to be a substantial interest, justifying the incidental limitations on the freedom of expression found to exist in those cases. Justice Souter found the type of entertainment provided by the Glen Theatre to be of the

same character as that at issue in the aforementioned cases. He thus concluded:

> It therefore is no leap to say that live nude dancing of the sort at issue here is likely to produce the same pernicious secondary effects as the adult films displaying "specified anatomical areas" at issue in *Renton* .... In light of *Renton*'s recognition that legislation seeking to combat the secondary effects of adult entertainment need not await localized proof of those effects, the State of Indiana could reasonably conclude that forbidding nude entertainment ... furthers its interest in preventing prostitution, sexual assault, and associated crimes.

*Id.* at 584, 111 S.Ct. at 2470.

As for the third prong of *O'Brien*, Justice Souter found that Indiana's interest in combating the secondary effects associated with sexually oriented businesses was "not at all inherently related to expression[,]" but rather the secondary effects "are correlated with the existence of establishments offering such dancing, without deciding what the precise causes of the correlation actually are." *Id.* at 585–86, 111 S.Ct. at 2470. Thus, "[b]ecause the State's interest in banning nude dancing results from a simple correlation of such dancing with other evils, rather than from a relationship between the other evils and the expressive component of the dancing, the interest is unrelated to the suppression of free expression." *Id.* at 586, 111 S.Ct. at 2471.

As to the fourth prong of *O'Brien*, that the restriction is no greater than is essential to further the governmental interest, Justice Souter succinctly stated that limitation requiring pasties and a G-string "is minor when measured against the dancer's remaining capacity and opportunity to express the erotic message." *Id.* at 587, 111 S.Ct. at 2471. Although pasties and a G-string "moderate the expression to some degree ... dropping the final stitch is prohibited." *Id.* However, the dancer and her employer were otherwise not limited, short of obscenity laws, in the ways in which the erotic message could be conveyed.

By contrast, Justice Scalia, concurring only in the judgment, found that the statute should be upheld not because it could survive First Amendment scrutiny under any level of evaluation, but because the statute was a "general law regulating conduct and not specifically directed at expression, [and thus] it [was] not subject to First Amendment scrutiny at all." *Id.* at 572, 111 S.Ct. at 2463. Justice Scalia suggested that the performances at issue in this case were not expressive activities because it is not "conduct that is normally engaged in for the purpose of communicating an idea." *Id.* at 578, 111 S.Ct. at 2466, n. 4. Additionally, Justice Scalia disagreed with the plurality's conclusion insofar as it supported an analysis that "requires judicial assessment of the 'importance' of government interests—and especially of government interests in various aspects of morality." *Id.* at 580, 111 S.Ct. at 2467. Thus, Justice Scalia would have held Indiana's indecency statute constitutional, finding Indiana's moral opposition to the prohibition against nude dancing sufficient under a rational basis review. *Id.* at 580, 111 S.Ct. at 2468.

Although decided by a plurality of the Court, *Barnes* is important for what it says about the second prong of the *O'Brien* test. Justice Souter's distinction with regard to the justification necessary to satisfy *O'Brien*, as well as the Court's appropriate function in evaluating the justification offered for the regulation, suggests that evidence proffered by a party contesting the constitutionality of a regulation should be geared toward disproving

the governmental interest at the time the regulation is enacted as opposed to uncovering an illegitimate governmental motive. This notion can be more adequately developed, however, following a discussion of the burden-shifting involved in contesting such a regulation, an issue covered in the cases that follow.

### 7. *City of Erie v. Pap's A.M.*

In *City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000), the Supreme Court upheld an ordinance enacted by the City of Erie (Pennsylvania), which made it an offense to knowingly or intentionally appear in public in a state of nudity. Similar to the indecency statute at issue in *Barnes, supra,* as well as in the case at bar, Erie's statute required that exotic dancers wear, at a minimum, pasties and a G-string.

The plurality opinion, written by Justice O'Connor, in which Chief Justice Rehnquist, Justice Kennedy, and Justice Breyer joined, "clarify[ied] that government restrictions on public nudity such as the ordinance at issue here should be evaluated under the framework set forth in *O'Brien* for content-neutral restrictions on symbolic speech." *Id.* at 289, 120 S.Ct. at 1391. With that, the plurality found that the Erie ordinance generally prohibited all public nudity, "regardless of whether that nudity [was] accompanied by expressive activity." *Id.* at 290, 120 S.Ct. at 1391. The plurality also noted that Erie's ordinance contained a preamble, which stated that the ordinance was adopted " 'for the purpose of limiting a recent increase in nude live entertainment within the City, which activity adversely impacts and threatens to impact on public health, safety and welfare by providing an atmosphere conducive to violence, sexual harassment, public intoxication, prostitution, the spread of sexually transmitted diseases and other deleterious effects.' " *Id.* at 290, 120 S.Ct.

at 1391–92 (citation omitted). The plurality, in recognizing the findings by the Pennsylvania Supreme Court, noted that one purpose of the ordinance was to combat negative secondary effects.

As in the Court's previous opinions, the plurality here found that *Erie*'s ordinance does not attempt to regulate the primary effects of the expression, *i.e.*, the effect on the audience of watching nude erotic dancing, but rather the secondary effects, such as the impacts on public health, safety, and welfare, which we have previously recognized are "caused by the presence of even one such" establishment.

*Id.* at 291, 120 S.Ct. at 1392 (citing *Renton,* 475 U.S. at 47–48, 50, 106 S.Ct. at 930) (additional citation omitted). The operator of the establishment in Erie argued that the ordinance was "aimed at" suppressing expression, and noted the comments of an attorney for the city, who stated that the public nudity ban was not intended to apply to "legitimate" theater productions. Thus, Pap's A.M. alleged the city council had an illicit motive in enacting the regulation. However, as the Court had held in *O'Brien* and *Renton, supra,* it would not strike down "an otherwise constitutional statute on the basis of an alleged illicit motive." *Pap's A.M.,* 529 U.S. at 292, 120 S.Ct. at 1392–93.

Much of the reasoning offered in *Pap's A.M.* was similar to that found in *Barnes.* However, the plurality had to contend with Justice Stevens' dissent, in which he argued that the ordinance enacted a complete ban on expression. While recognizing that the public nudity ban had the effect of restricting one particular mode of expression, Justice O'Connor opined that "simply to define what is being banned as the 'message' is to assume the conclusion." *Id.* at 293, 120 S.Ct. at 1393. Thereafter, Justice O'Connor compared the regulation

in *O'Brien* against destroying one's draft card, justified by "the Government's interest in preventing the harmful 'secondary effects' of that conduct (disruption to the Selective Service System)," to the Erie ordinance, and concluded that "[a]lthough there may be cases in which banning the means of expression so interferes with the message that it essentially bans the message, that is not the case here." *Id.*

In support of this position, the plurality noted that "[t]he State's interest in preventing harmful secondary effects is not related to the suppression of expression.... [Rather,] the ordinance seeks to deter crime and the other deleterious effects caused by the presence of such an establishment in the neighborhood." *Id.* (citing *Renton,* 475 U.S. at 50–51, 106 S.Ct. 925, 89 L.Ed.2d 29). Similarly, the plurality found that, although the ban minimally affected the expression "that occurs when the last stitch is dropped," the dancers were still free to perform wearing pasties and G-strings, and thus "[a]ny effect on the overall expression is *de minimis.*" *Id.* at 294, 120 S.Ct. at 1393. "If States are to be able to regulate secondary effects, then *de minimis* intrusions on expression such as those at issue here cannot be sufficient to render the ordinance content based."

In upholding the validity of the Erie ordinance under the four-part *O'Brien* test, the plurality found that the secondary effects associated with nude dancing are "undeniably important." *Id.* at 296, 120 S.Ct. at 1395. More importantly, however, the plurality reiterated that

> in terms of demonstrating that such secondary effects pose a threat, the city need not "conduct new studies or produce evidence independent of that already generated by other cities" to demonstrate the problem of secondary effects, "so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses."

*Id.* (quoting *Renton,* 475 U.S. at 51–52, 106 S.Ct. 925, 89 L.Ed.2d 29). Thus, because the nude dancing at issue in Erie was of the "same character" as the entertainment at issue in *Renton, Young,* and *LaRue, supra,* "it was reasonable for Erie to conclude that such nude dancing was likely to produce the same secondary effects." *Id.* at 297, 120 S.Ct. at 1395.

Here, again, the plurality addresses the evidentiary basis necessary to support a government's substantial interest in preventing the asserted secondary effects while minimally intruding on protected expression. In so doing, the plurality cites *O'Brien, supra,* for the fact that there, the Court did not require evidence

> that the integrity of the Selective Service System would be jeopardized by the knowing destruction ... of draft cards. It simply reviewed the Government's various administrative interests in issuing the cards, and then concluded that "Congress has a legitimate and substantial interest in preventing their wanton and unrestrained destruction ...."

*Id.* at 298–99, 120 S.Ct. at 1396 (quoting *O'Brien,* 391 U.S. at 378–380, 88 S.Ct. 1673, 20 L.Ed.2d 672). The Court noted that there were no studies documenting the actual effects of card mutilation on the Government's asserted interests and that the Court permitted Congress to take "official notice ... that draft card destruction would jeopardize the system." *Id.* at 299, 120 S.Ct. at 1396. Thus the Court recognized some leeway is appropriate so long as the regulation is unrelated to the suppression of expression.

Moreover, the Court acknowledged that *O'Brien* required no evidentiary showing

that the threatened harm was real.[15] Although Justice Souter, in his dissent, suggests that empirical analysis is required rather than allowing a city to justify a regulation on the basis of experiences and findings in other cities, the plurality rejects such a contention on the basis of the Court's prior holding in *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 394, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (noting that the "invocation of academic studies said to indicate" that certain harms are not real is insufficient to cast doubt on the experience of the local government). Thus, the Court found the city must be allowed a " 'reasonable opportunity to experiment with solutions to admittedly serious problems,' " *Id.* at 301, 120 S.Ct. at 1397 (quoting *Renton*, 475 U.S. at 52, 106 S.Ct. 925, 89 L.Ed.2d 29), "but the city must balance its efforts to address the problem with the requirement that the restriction be no greater than necessary to further city's interest." *Id.*

Finally, the plurality opinion recognized that the city council members were the individuals with first-hand knowledge of the particular problems associated with nude dancing establishments. Thus, the city council members could make "particularized, expert judgments about the resulting harmful secondary effects." *Id.* at 298, 120 S.Ct. at 1395. Moreover, the Court noted that Pap's A.M. had not succeeded in casting "any specific doubt on the validity of [the city's] findings.... In the absence of any reason to doubt it, the city's expert judgment should be credited." *Id.* at 298, 120 S.Ct. at 1396. Although instructive, the Court's emphasis on the bur-

den-shifting inherent in the analysis was more fully developed in its most recent opinion to date regarding an ordinance enacted by the City of Los Angeles.

8. *City of Los Angeles v. Alameda Books, Inc.*

In *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (O'Connor, J., plurality), the Court, in another plurality opinion, upheld a zoning ordinance passed by the City of Los Angeles, which prohibited the operation of multiple adult businesses in a single building. The narrow question before the Court concerned the appropriate "standard for determining whether an ordinance serves a substantial government interest under *Renton, supra.*" *Alameda Books*, 535 U.S. at 433, 122 S.Ct. at 1733.

The city of Los Angeles provided, as support for the ordinance, a 1977 study, which reported city crime patterns provided by the Los Angeles Police Department. "That report indicated that, during the period from 1965 to 1975, certain crime rates grew much faster in Hollywood, which had the largest concentration of adult establishments in the city, than in the city of Los Angeles as a whole." *Id.* at 435, 122 S.Ct. at 1734. The Ninth Circuit Court of Appeals found that the 1977 study did not support "the inference that a concentration of adult operations within a single adult establishment produced greater levels of criminal activity because the study focused on the effect that a concentration of establishments—not a concentration of operations within a single estab-

---

**15.** Appellee Jameson cites to *Edenfield v. Fane*, 507 U.S. 761, 770–71, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993), wherein the United States Supreme Court states that the government must "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material

degree." We find, however, that *Edenfield* is distinguishable in that it addressed commercial speech under the standard announced in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of N.Y.*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), and is thus not applicable to the facts of this case.

lishment—had on crime rates." *Id.* at 436, 122 S.Ct. at 1734–35.

The Supreme Court found the distinction inapposite. "The Court of Appeals' analysis ... implicitly requires the city to prove that its theory is the only one that can plausibly explain the data because only in this manner can the city refute the Court of Appeals' logic." *Id.* at 437–38, 122 S.Ct. at 1735. "The assumption behind [the city's] theory is that having a number of adult operations in one single adult establishment draws the same dense foot traffic as having a number of distinct adult establishments in close proximity...." *Id.* at 436, 122 S.Ct. at 1735. Thus the city's inference that reducing the concentration of adult operations in a neighborhood would reduce crime rates was rational.

This is not to say, however, that the city had to disqualify other possible theories to support its rationale.

> While the city certainly bears the burden of providing evidence that supports a link between concentrations of adult operations and asserted secondary effects, it does not bear the burden of providing evidence that rules out every theory for the link between concentrations of adult establishments that is inconsistent with its own.

*Alameda Books,* 535 U.S. at 437, 122 S.Ct. at 1735.

More importantly, the Court recognized that a municipality cannot offer "shoddy data" as justification for an ordinance.

> The municipality's evidence must fairly support its rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the *Renton* standard. If plaintiffs suc-

ceed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Id.* at 439, 122 S.Ct. at 1736 (citations omitted).

Justice Souter, whose concurring opinion in *Barnes, supra,* provided the narrowest grounds to support the Court's decision and thus constituted the holding therein, dissented in *Alameda Books.* In his dissent, he suggests that the city "demonstrate, not merely by appeal to common sense, but also with empirical data, that its ordinance will successfully lower crime." *Id.* at 439, 122 S.Ct. at 1736 (O'Connor, J., plurality). The plurality opinion, however, found that "such a requirement would go too far in undermining our settled position that municipalities must be given a reasonable opportunity to experiment with solutions to address the secondary effects" associated with sexually oriented businesses. *Id.* (internal quotations omitted) (citations omitted).

Moreover, the Court noted that "[a] municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously." *Id.* at 439–40, 122 S.Ct. at 1736. Furthermore, the Court acknowledged that Los Angeles City Council members were in a better position to gather and evaluate data on local problems than the judiciary. And, in any event, "*Renton* requires that municipal ordinances receive only intermediate scrutiny if they are content neutral." *Id.* at 440, 122 S.Ct. at 1737.

**C. Court of Appeals erred as a matter of law.**

*1. Content neutral character of Ordinance No.2000–4.*

A number of federal court decisions have followed in the wake of *Alameda Books, supra,* including the Eleventh Circuit Court of Appeals' decision in *Peek–A–Boo Lounge of Bradenton, Inc. v. Manatee County, Florida,* 337 F.3d 1251 (11th Cir. 2003), *cert. denied,* 541 U.S. 988, 124 S.Ct. 2016, 158 L.Ed.2d 491 (2004), which our own Court of Appeals relied upon in finding that Jameson has successfully cast "direct doubt" on the rationale and findings offered by the McCracken County Fiscal Court in support of Ordinance No.2000–4.

In *Peek–A–Boo Lounge,* the Eleventh Circuit held, *inter alia,* that public nudity ordinances insofar as they are content neutral should be evaluated under the four-part *O'Brien* test and that zoning ordinances "regulating the conditions under which adult entertainment businesses may operate should be evaluated under the standards for time, place, and manner regulations set forth in *Renton* and reaffirmed in *Alameda Books.*" *Peek–A–Boo Lounge,* 337 F.3d at 1264. Our Court of Appeals has similarly recognized this distinction, but like the Supreme Court in *Barnes, supra,* the Court of Appeals has recognized that the *Renton* test "has been interpreted to embody much the same standards as those set forth in [O'Brien]." *Barnes,* 501 U.S. at 566, 111 S.Ct. at 2460; *see also Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

Thus, the Court of Appeals properly began its deliberation by determining whether Section VII(b) of the McCracken County ordinance was content neutral or content based. In concluding that the ordinance was content based, the Court of Appeals found that, unlike the ordinances at issue in *Barnes* and *Pap's A.M., supra,* Section VII(b) "only prohibits nudity in a sexually-oriented business if an individual is 'engaged in any live performance.' " Slip Op. at 16. Despite finding the ordinance was content based, the Court of Appeals held that the ordinance was aimed at controlling the negative secondary effects associated with sexually oriented businesses, that the requirement that dancers wear pasties and G-strings was *de minimis,* and thus could nonetheless be analyzed under the four-part test set forth in *O'Brien.* To date, there is no Supreme Court case which has held that a "content based" regulation may be analyzed under an intermediate level of scrutiny.[16] However, we find that the ordinance is content neutral for the reasons set forth below, and thus we will analyze it accordingly.

In *Pap's A.M., supra,* a plurality of the Court found that the Erie ordinance, which, similar to Section VII(b) of the ordinance at issue here, had the effect of requiring exotic dancers to wear the *de minimis* covering of pasties and G-strings, was content neutral. Justice O'Connor explained that, "[t]o determine what level of scrutiny applies to the ordinance at issue here, we must decide 'whether the State's regulation *is related to the suppression of expression.*' " *Pap's A.M.,* 529 U.S. at 289, 120 S.Ct. at 1391 (quoting *Texas v. Johnson,* 491 U.S. 397, 403, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)). "If the governmental purpose in enacting the regulation is unrelated to the suppression of expression, then the regulation need only satisfy the

---

**16.** Jameson has attempted to argue that a heightened level of scrutiny, reserved only for content based regulations, is the appropriate test in this case for analyzing the McCracken County ordinance. Yet, Jameson failed to file a cross-appeal on this issue, and we did not grant review on that basis. Thus the question of whether a heightened level of scrutiny must be applied is not before this Court.

'less stringent' standard from *O'Brien* for evaluating restrictions on symbolic speech." *Id.* (citing *Johnson*, 491 U.S. at 403, 109 S.Ct. 2533, 105 L.Ed.2d 342; *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673, 20 L.Ed.2d 672). However, "[i]f the government interest is related to the content of expression . . . then the regulation . . . must be justified under a more demanding standard." *Id.* (citing *Johnson*, 491 U.S. at 403, 109 S.Ct. 2533, 105 L.Ed.2d 342).

Justice O'Connor, relying on the *Barnes* decision, held that the government interest inherent in the Erie ordinance was that of "combating crime and other negative secondary effects caused by the presence of adult entertainment establishments . . . and not at suppressing the erotic message conveyed by this type of nude dancing." *Id.* at 291, 120 S.Ct. at 1392. In other words, the ordinance attempted to regulate the secondary effects commonly associated with "the presence of even one such" establishment, rather than "the effect on the audience of watching nude erotic dancing[.]" *Id.* (citing *Renton*, 475 U.S. at 47–48, 106 S.Ct. 925, 89 L.Ed.2d 29). And, to clarify the point, Justice O'Connor held that "government restrictions on public nudity . . . should be evaluated under the framework set forth in *O'Brien* for content-neutral restrictions on symbolic speech." *Id.* at 289, 120 S.Ct. at 1391.

In applying this rationale to Section VII(b) of McCracken Ordinance No.2000–4, we find that the ordinance has the primary effect of combating crime, prostitution, the spread of sexually transmitted diseases and declining property values, otherwise known as the negative secondary effects generally associated with sexually oriented businesses. "If States are to be able to regulate secondary effects, then *de minimis* intrusions on expression such as those at issue here cannot be sufficient to render the ordinance content based." *Pap's A.M.*, 529 U.S. at 294, 120 S.Ct. at 1394; *see also Clark*, 468 U.S. at 299, 104 S.Ct. 3065, 82 L.Ed.2d 221; *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (holding that even if the regulation incidentally effects some speakers or messages but not others, the regulation is content neutral if it can be justified without reference to the content of the expression). Thus, we hold that the ordinance at issue here is content neutral.

Although the Court of Appeals erroneously found the ordinance here to be content based, it nonetheless found the correct standard to be applied was that set forth in *O'Brien*. However, the Court of Appeals stopped short of applying *O'Brien*, and instead remanded the case to the district court based on its interpretation of the Supreme Court's opinion in *Alameda Books*, *supra*, wherein the Court clarified how a court is to interpret the third step of the *Renton* analysis and the second prong of the *O'Brien* test. *See Peek–A–Boo Lounge*, 337 F.3d at 1264–65. We believe the court erred in this respect as Jameson must present evidence sufficient to cast "direct doubt" on the municipality's evidence and rationale, not just present any evidence. Thus this Court will review the ordinance *de novo* in light of the plurality opinions in *Barnes* and *Pap's A.M.*, *supra*, wherein the *O'Brien* test was applied, as well as the burden-shifting analysis of *Alameda Books*, *supra*.

In applying the first prong of *O'Brien*, we find that the McCracken County Ordinance No.2000–4 is clearly within the constitutional power of the county to enact.[17]

---

**17.** KRS 67.803(3)(z) provides: "The fiscal court shall have the power to carry out governmental functions necessary for the operation of the county. Except as otherwise pro-

Similarly, the third prong of *O'Brien* is satisfied as the government's interest in preventing negative secondary effects associated with sexually oriented businesses, such as Regina's II, is unrelated to the suppression of expression. *See Pap's A.M.*, 529 U.S. at 293, 120 S.Ct. at 1393. Finally, *O'Brien's* fourth prong is likewise satisfied as the requirement of "pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message." *Id.* at 301, 120 S.Ct. at 1397. There is, however, dispute as to whether the ordinance furthers a substantial government interest, *O'Brien's* second prong, as well as that quantum of evidence necessary to satisfy *Alameda Books'* burden shifting analysis.

*2. Furthering a Substantial Government Interest & Shifting the Burden.*

Thus, the primary issue in this appeal is the Court of Appeals' determination that the second prong of *O'Brien*—whether the ordinance furthers the government's substantial interest—was unsatisfied, based on Jameson's alleged ability to cast "direct doubt" on the rationale and findings offered by the McCracken County Fiscal Court in support of Ordinance No.2000–4. The Court of Appeals thus concluded that the burden then shifted to the McCracken County Fiscal Court to proffer supplemental evidence in support of its contention that requiring the dancers at Regina's II to wear pasties and G-strings would further the government's interest in preventing the negative secondary effects discussed throughout this opinion. We find the Court of Appeals erred in its ruling for several reasons.

"The asserted interests of regulating conduct through a public nudity ban and of combating the harmful secondary effects associated with nude dancing are undeniably important." *Pap's A.M.*, 529 U.S. at 296, 120 S.Ct. at 1395. Furthermore, this justification is unrelated to the suppression of expression, despite any incidental burdens the restriction may place on the erotic message conveyed by nude dancing. "[R]equiring dancers to wear pasties and G-strings may not greatly reduce these secondary effects, but *O'Brien* requires only that the regulation further the interest in combating such effects." *Id.* at 301, 120 S.Ct. at 1397. Moreover, "*O'Brien* ... required no evidentiary showing at all that the threatened harm was real." *Id.* at 299, 120 S.Ct. at 1396. We note, though, that the legislative concern of such harm must be real, not just a pretext for suppression of protected expression.

▆▆▆ Moreover, a city may rely upon any evidence "reasonably believed to be relevant" for demonstrating that completely nude dancing contributes to the deterioration of residential and commercial neighborhoods. *Alameda Books*, 535 U.S. at 438, 122 S.Ct. at 1736; *Renton*, 475 U.S. at 51–52, 106 S.Ct. at 931. This includes, but is not limited to, the experiences of, and studies produced by, other cities, as well as "detailed findings" in judicial opinions. *Pap's A.M.*, 529 U.S. at 297, 120 S.Ct. at 1395; *Renton*, 475 U.S. at 50–51, 106 S.Ct. at 930–31. However, "[t]he municipality's evidence must *fairly* support the municipality's rationale for its ordinance." *Alameda Books*, 535 U.S. at 438, 122 S.Ct. at 1736 (emphasis added).

---

vided by statute or the Kentucky Constitution, the fiscal court of any county may enact ordinances, issue regulations, levy taxes, issue bonds, appropriate funds, and employ person-

nel in performance of the following public functions: Regulation of establishments or commercial enterprises offering adult entertainment and adult entertainment activities."

Admittedly, the initial burden on the city is not a rigid one. "Even in cases addressing regulations that strike closer to the core of First Amendment values, [the Court has] accepted a state or local government's *reasonable belief* that the experience of other jurisdictions is relevant to the problem it is addressing." *Pap's A.M.*, 529 U.S. at 297, 120 S.Ct. at 1395 (emphasis added). Furthermore, a city must be given "a reasonable opportunity to experiment with solutions" to the problems posed by the presence of "adult" establishments, such as Regina's II. *Young*, 427 U.S. at 71, 96 S.Ct. at 2453. A city is not required, "before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities[.]" *Renton*, 475 U.S. at 51, 106 S.Ct. at 931. Finally, municipalities may "rely, in part, on 'appeal to common sense,'" in enacting an ordinance. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1186 (10th Cir.2003) (quoting *Alameda Books*, 535 U.S. at 439, 122 S.Ct. at 1736).

The Court of Appeals recognized these principles when it stated that "cities are entitled to rely on studies from other municipalities and even prior court precedents which tend to establish the link between sexually oriented businesses and those negative secondary effects." Slip Op. at 21. Yet, it failed to articulate how Jameson's evidence successfully cast "direct doubt" on McCracken County's evidentiary findings, which were based in part on the findings of the various courts in *Renton, Young*, and *Barnes, supra*, as well as the County's findings that illicit sexual behavior occurs in sexually oriented businesses. Absent its rationale as to how Jameson had presented "actual and convincing evidence" sufficient to cast "direct doubt" on the rationale and evidence proffered by McCracken County, we are left to our own review of the record.

Although an exact definition of what may constitute "actual and convincing evidence" sufficient to cast "direct doubt" on a municipality's pre-enactment rationale has not yet been provided, we can surmise what it necessarily does not encompass. In *Alameda Books, supra*, the United States Supreme Court rejected the Ninth Circuit Court of Appeals' conclusion that "the city [of Los Angeles had] to prove that its theory about a concentration of adult operations attracting crowds of customers ... is a necessary consequence of the 1977 study" relied upon by the city in enacting an ordinance prohibiting the operation of multiple adult businesses in a single building. *Alameda Books*, 535 U.S. at 437, 122 S.Ct. at 1735. Although the Supreme Court recognized that a city bears the burden of showing a nexus between concentrations of adult businesses and secondary effects, the Court was unwilling to place upon the city the onerous burden of requiring it to "rule[ ] out every theory for the link between concentrations of adult establishments that is inconsistent with its own." *Id.* Further, the Court reiterated that it, in *Renton*, it had refused to set such a high bar and that a city could rely on *any* evidence, short of "shoddy data," that the city "reasonably believed to be relevant" for establishing a link between the regulation and a substantial government interest. *Id.* at 438, 122 S.Ct. at 1736 (citing *Renton*, 475 U.S. at 51–52, 106 S.Ct. 925, 89 L.Ed.2d 29; *Barnes*, 501 U.S. at 584, 111 S.Ct. 2456).

Furthermore, the Supreme Court has explicitly rejected the requirement that a municipality show, by empirical data, that its ordinance will successfully "cure" the secondary effects attributed to the establishments at issue in this case. "Such a requirement would go too far in undermining our settled position that municipalities must be given a 'reasonable opportunity to

experiment with solutions' to address the secondary effects of protected speech." *Alameda Books,* 535 U.S. at 439, 122 S.Ct. at 1736 (quoting *Young,* 427 U.S. at 71, 96 S.Ct. 2440, 49 L.Ed.2d 310); *see also Pap's A.M.,* 529 U.S. at 300, 120 S.Ct. at 1397 (addressing Justice Souter's dissent, wherein he would require empirical analysis, and recognizing that this idea has been "flatly rejected"); *Nixon,* 528 U.S. at 394, 120 S.Ct. 897, 145 L.Ed.2d 886 (noting that the "invocation of academic studies said to indicate" that certain threatened harms were not real was insufficient to cast doubt on the experience of the local government).

■ As for the burden-shifting analysis set forth in *Alameda Books,* we note that the procedure therein does not advance the notion that challengers, such as Jameson, can merely devise their own theories of secondary effects. Instead, the challenger must present "actual and convincing evidence" that specifically rebuts the municipality's rationale for the ordinance. To require otherwise would essentially require "the [county to] provide evidence that not only supports the claim that its ordinance serves an important government interest, but also does *not* provide support for any other approach to serve that interest." *Alameda Books,* 535 U.S. at 438, 122 S.Ct. at 1736 (emphasis added). Moreover, the task of casting "direct doubt" on the legislative judgment has been described as a "heavy burden," involving the rebuttal of more than just some of the categories of secondary effects relied upon by the municipality. *See, e.g., Fantasyland Video v. County of San Diego,* 373 F.Supp.2d 1094, 1110 (S.D.Cal.2005).

■ Justice Kennedy, in his concurring opinion in *Alameda Books,* recognized that local governments are in a much better position to evaluate the conditions that exist in their cities and that courts should not second-guess their assessments of

such. *Alameda Books,* 535 U.S. at 451–52, 122 S.Ct. at 1743 (Kennedy, J., concurring). If the regulation furthers the government's interest in preventing at least one of the identified secondary effects, it meets the substantial government interest requirement. *See, e.g., World Wide Video of Washington, Inc. v. City of Spokane,* 368 F.3d 1186, 1196 (9th Cir.2004) (finding that the elimination of pornographic litter, by itself, represented a substantial government interest); *SOB, Inc. v. County of Benton,* 317 F.3d 856, 863 (8th Cir.2003) (noting that the adult business's evidence addressed only two adverse secondary effects, property value and crime in the vicinity of the establishment, both of which were relevant to zoning, but did not diminish the county's interest in combating other adverse secondary effects such as prostitution and drug use). To that we add that it is irrelevant whether the local government is actually wrong regarding the extent of all the secondary effects that have actually occurred or may occur in the future when considering its decision to regulate the sexually oriented business. Rather, the emphasis is on whether the decision to regulate is merely a pre-text to suppress the freedom of expression. And, of course, evidence of the occurrence, or non-occurrence, of the feared secondary effects will bear on the reasonableness of the legislative belief for the need of such regulation. But, such evidence must rise to the level of casting "direct doubt" on the county's evidence supporting that reasonable belief, including whether the county's interest is, indeed, substantial.

*3. Municipality is not required to prove "local" secondary effects.*

■ In reversing and remanding the case to the district court, the Court of Appeals held that Jameson had successfully shifted the burden back to the McCracken County Fiscal Court by dem-

onstrating a lack of secondary effects *in McCracken County.* In doing so, the Court required on remand that the fiscal court must "proffer supplementary evidence indicating that Section Vll(b)'s ban on totally nude dancing furthers a substantial government interest *in McCracken County.*" Slip Op. at 24 (emphasis in original). Not only does *Alameda Books* not support such a conclusion, but the requirement of a finding of local secondary effects essentially changes substantive law regarding the secondary effects evidence necessary to further a substantial government interest. Thus the Court of Appeals erred in so ruling.

Initially, we note that *Alameda Books* retained the Court's holding in *Renton, supra,* wherein a substantial government interest could be furthered by "any evidence reasonably believed to be relevant." *Alameda Books,* 535 U.S. at 438, 122 S.Ct. at 1736. However, the Court of Appeals erred by relying on *Peek–A–Boo Lounge, supra,* in support of a local secondary effects finding requirement.

*Peek–A–Boo Lounge* is distinguishable not only because the regulation at issue there was more restrictive, but also because the adult business, which challenged the regulation, hired actual expert witnesses and submitted volumes of evidence directly attacking the studies relied upon by the county. *See Peek–A–Boo Lounge,* 337 F.3d 1251 (11th Cir.2003). Furthermore, the ruling in *Peek–A–Boo Lounge* is against the weight of cases decided under the *Renton* standard both pre- and post-*Alameda Books, supra.* *See, e.g., BZAPS, Inc. v. City of Mankato,* 268 F.3d 603, 606 (8th Cir.2001); *SOB, Inc. v. County of Benton,* 317 F.3d 856, 863 (8th Cir.2003). We thus decline to adopt the rationale offered by the eleventh circuit in *Peek–A–Boo Lounge* wherein the court concluded that "the constitutionality of an ordinance

will depend on local conditions." *Peek–A–Boo Lounge,* 337 F.3d at 1272 (quoting *Flanigan's Enterprises, Inc. v. Fulton County, Ga.,* 242 F.3d 976, 987 (11th Cir. 2001)).

In *Renton,* the Supreme Court addressed the Ninth Circuit's holding that the city of Renton had improperly relied on the findings of other cities "in lieu of evidence about the effects of adult theaters on Renton," and thus the city's justifications for the ordinance were conclusory and speculative. *Renton,* 475 U.S. at 46, 106 S.Ct. at 928 (internal citations omitted). In rejecting that holding, the Supreme Court concluded that this would impose an "unnecessarily rigid burden of proof" and that Renton was entitled to rely on evidence from other jurisdictions as well as prior judicial decisions. *Id.* at 51–52, 106 S.Ct. at 930–31. Our Court of Appeals has similarly held that

> [u]nder *[City of] Erie [v. Pap's A.M.],* the government is not required to demonstrate actual adverse effects in its particular locality. It is enough to show that it is aware of the problems in other locales and the ordinance was passed to prevent or reduce those effects. It need not await localized proof of those effects.

*Restaurant Ventures, LLC v. Lexington–Fayette Urban County Government,* 60 S.W.3d 572, 578–79 (Ky.App.2001) (citation omitted). Furthermore, "[a]ll five Justices in the *Alameda Books* majority affirmed *Renton's* core principle that local governments are not required to conduct their own studies in order to justify an ordinance designed to combat the secondary effects of adult businesses." *World Wide Video,* 368 F.3d at 1193.

Indeed, requiring a city to conduct its own studies would require that these conditions already exist, obviating the need for any form of burden shifting analysis. *See Wall Distributors, Inc. v. City of New-*

*port News,* 782 F.2d 1165, 1169–70 n. 7 (4th Cir.1986) (holding that "[t]o insist that governmental interests justifying [adult] use legislation could only be found in specific local experiences and conditions would be unrealistically to require deliberate subjection to those experiences and conditions before attempting to avoid them"). Furthermore, the principle behind the secondary effects doctrine leaves open the possibility that a given jurisdiction may be subjected, at some point in the *future,* to such deleterious effects should a sexually oriented business decide to open an adult establishment in that location.

In this case, Jameson failed to present "actual and convincing evidence" sufficient to cast "direct doubt" on the fiscal court's rationale or findings or that the secondary effects generally associated with sexually oriented businesses are merely a pre-textual justification for the suppression of protected expression. Merely presenting evidence showing a lack of some *local* secondary effects is insufficient to override the fiscal court's rationale and findings. In validating this argument, the Court of Appeals erred.

*4. Testimony offered by Jameson's witnesses.*

During the hearing before the district court on October 18, 2001, Jameson presented the testimony of several witnesses in an effort to invalidate the secondary effects rationale relied upon by the fiscal court. Such evidence did not attack the county's reliance on the studies, but only some of the county's conclusions as to the probable validity of those studies. The district court then denied Jameson's motion to declare the ordinance unconstitutional, and this ruling was affirmed by the McCracken Circuit Court. The Court of Appeals, however, reversed, and found the testimony given by these witnesses was sufficient to shift the evidentiary burden back to the fiscal court, and Jameson would likewise have this Court find that the testimony and evidence offered was sufficient. We cannot agree, and again we find that the Court of Appeals erred in concluding that the testimony and evidence offered was sufficient to shift the evidentiary burden back to the McCracken County Fiscal Court.

Initially, we note that, at the time of the hearing in the district court, *Alameda Books* had not been decided. Thus, the burden-shifting analysis set forth in that case was not available at that time. However, this does not change our analysis of the Court of Appeals' decision, nor does it change the outcome of this appeal. With that, we turn to the witnesses and evidence offered by Jameson in his attempt to invalidate the rationale offered by the fiscal court in support of Ordinance No.2000–4.

Mr. Brent Stringer, chief dispatcher for Paducah/McCracken E–911 Communications Services, testified to raw police call data, selected by Jameson's counsel, and which compared the number of calls for police service at Regina's II and The Playhouse to the number of calls for police service at several non-sexually oriented nightclubs in the same area of town. Mr. Stringer also testified that not all criminal investigations are reported on the E–911 call sheets, specifically in regard to undercover investigations. Nor did he testify as to whom, if anyone, would typically call 911 to complain about observing or engaging in illicit sexual behavior or other unwholesome or unhealthy activity on the premises of an adult business.

While the raw police call evidence may certainly be useful for some other purpose, it is insufficient to establish that the fiscal court used elevated crime as a pre-textual justification for the ordinance, if nothing else because it fails to compare incidents

occurring in and around sexually oriented businesses to similarly situated establishments. Furthermore, even if true, the evidence still does not disprove that enactment of the ordinance requiring the *de minimis* coverings of pasties and G-strings may reduce criminal activity and further an important governmental interest. *See Kentucky Restaurant Concepts, Inc. v. City of Louisville, Jefferson County, Ky.*, 209 F.Supp.2d 672, 680 (W.D.Ky. 2002).

Moreover, Jameson did not attempt to qualify Mr. Stringer as an expert in secondary effects associated with sexually oriented businesses or that he had experience in analyzing raw police call data as it rationally relates to sexually oriented businesses. While Mr. Stringer may be an expert in his designated field of employment, he is not otherwise an expert in this critical area, and thus the Court of Appeals' reliance upon this evidence in finding that Jameson had met his "heavy burden" was erroneous.

Jameson also offered the testimony of Mr. George Wiley, a local real estate agent, who testified to his experience as to the prices paid for various properties sold on the "south side of Paducah" from 1994 to 2001. Significantly, Mr. Wiley merely testified to what property on the "south side of Paducah" is selling for now and that the property was not selling fifteen to twenty years prior to 2001. This evidence failed, however, to provide any historical or scientific relevance that prices for real estate on the "south side of Paducah" had increased or decreased over time, aside from the impact of the entrance of Wal-Mart into the area.

Even were we to accept the Court of Appeals characterization of the evidence concerning property values and reported calls for police service, we would still find the evidence insufficient to shift the evidentiary burden in this case. As we have previously stated, the ordinance would still serve at least one valid governmental interest to satisfy the "substantial government interest" requirement of *O'Brien. See, e.g., Fantasyland Video,* 373 F.Supp.2d at 1110; *World Wide Video, Inc.,* 368 F.3d at 1196. Here, that could be, at the least, preventing the transmission of sexually transmitted diseases. This is bolstered by the testimony of Jameson and the owner of another area adult establishment that they had rules in place to prevent contact between dancers and patrons. Furthermore, "[a]lthough this evidence shows that the [fiscal court] might have reached a different conclusion regarding the relationship between adverse secondary effects and sexually oriented businesses, it is not sufficient to vitiate the result reached in the [fiscal court's] legislative process." *G.M. Enterprises, Inc. v. Town of St. Joseph, Wisconsin,* 350 F.3d 631, 639 (7th Cir.2003).

■ We note that *Alameda Books* does not require this court to re-weigh the evidence relied upon by the fiscal court, "nor does it empower a court to substitute its judgment in regards to whether a regulation will best serve a community, so long as the regulatory body has satisfied the *Renton* requirement that it consider evidence 'reasonably believed to be relevant to the problem' addressed." *G.M. Enterprises,* 350 F.3d at 639–40 (citing *Renton,* 475 U.S. at 51–52, 106 S.Ct. 925, 89 L.Ed.2d 29; *Alameda Books,* 535 U.S. at 445, 122 S.Ct. 1728, 152 L.Ed.2d 670 (Kennedy, J., concurring)). The judiciary should not second-guess the judgment of local government officials. *See Alameda Books,* 535 U.S. at 451, 122 S.Ct. at 1743 (Kennedy, J., concurring). And, substantial deference is afforded local officials in their assessments and inferences of solutions to problems within their city. *See Heideman,* 348 F.3d at 1199. Furthermore,

[t]o cast direct doubt, the challenger must present evidence that is *directly contrary* to the municipality's evidence, not simply produce a general study refuting all secondary effects. This is not a new or heightened evidentiary standard as this interpretation is consistent with the holding in *Renton*, which established the proper evidentiary burden of the parties. *City of Elko v. Abed*, 677 N.W.2d 455, 465 (Minn.App.2004). Moreover, we find, as others courts have likewise found, that *Alameda Books, supra*, did not create a new evidentiary standard. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 516 (4th Cir.2002) (finding that a city or state carries a minimal burden in establishing a substantial government interest); *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471, 481 (5th Cir.2002) (finding that empirical data is not required to show that the ordinance will lower crime rates); *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 721–22 (7th Cir.2003) (citing Justice Kennedy's concurrence in *Alameda Books* wherein he opined that a municipality's burden in establishing a substantial government interest is slight); *City of Elko v. Abed*, 677 N.W.2d 455, 465 (Minn.App.2004) (concluding that *Alameda Books* did not establish a "new" evidentiary standard).

Finally, we note that were we to accept the Court of Appeals' reading of *Alameda Books*, the burden would shift to the municipality to proffer supplementary evidence as justification for a regulation whenever a challenger presents evidence which casts *any* doubt on the municipality's rationale. "Parties to these cases would [then] be on a never-ending merry-go-round of burden shifting." *Abed*, 677 N.W.2d at 464.

For the reasons outlined above, we find that McCracken County Ordinance No.2000–4 satisfies the second prong of *O'Brien* in that the ordinance furthers the county's substantial governmental interest in preventing and combating the negative secondary effects associated with sexually oriented businesses. Furthermore, Appellee Jameson has not presented evidence sufficient to shift the evidentiary burden back to the fiscal court by creating a jury issue that the rationale relied upon by the legislative body during its enactment was a pretext for suppression. The Court of Appeals erred in concluding otherwise.

### CONCLUSION

For the reasons set forth herein, we reverse the judgment of the Court of Appeals insofar as it remands this case to the district court for further evidentiary hearings and requires the McCracken County Fiscal Court to proffer supplementary evidence in support of Ordinance No.2000–4, and thus we reinstate the prior holding of the district court regarding the constitutionality of the ordinance.

All concur.