BLUE MOVIES, INC., d/b/a Love Boutique; Berry Boulevard Entertainment, Inc., d/b/a The Adult Toy Store; American Pride VI, Inc., d/b/a Lion's Den Adult Superstore; Taylor Boulevard Theatre, Inc., d/b/a Erotic Touch; TBC, Inc., d/b/a Metro Station; Danny's Inc., d/b/a Thorobred II; Entertainment Enterprises, Inc., d/b/a The Godfather; Gold Coast, Inc., d/b/a Thorobred III; Hayes Entertainment, Inc., d/b/a Thorobred IV; LLL, Inc., d/b/a Greenlight Lounge; Phat's Bar & Grill, Inc., d/b/a Phat's Bar & Grill; Riverview Entertainment, Inc., d/b/a Thorobred VI; South Dixie Entertainment, Inc., d/b/a Thorobred VII; Kentucky Restaurant Concepts, Inc., d/b/a PT's Showclub; Taylor Boulevard Theatre, Inc., d/b/a Déjà Vu; Teddy's Inc., d/b/a Thorobred V; Thorobred Inc., d/b/a Thorobred Lounge; Foxy Lady, Inc., d/b/a Foxy Lady Gentlemen's Club; Tinsley's Central Bar, Inc., d/b/a Bear Necessities, Inc.; Win Place and Show Bar, Inc., d/b/a Win, Place & Show Bar, Appellants,

v.

**LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT,**
Appellee.

No. 2007–DV–000812–DG.

Supreme Court of Kentucky.

April 22, 2010.

Rehearing Denied Aug. 26, 2010.

Edward Brian Davis, Paul S. Gold, Charles Michael Hatzell, Hatzell & Groves, Frank Mascagni III, Ronald Ludlow Cook, David Stuart Stevenson, Smith & Helman, Louisville, KY, H. Louis Sirkin, Sirkin, Pinales & Schwartz, LLP, Cincinnati, OH, Bradley J. Shafer, Shafer & Associates, P.C., Lansing, MI, Counsel for Appellants.

Winston King, Assistant County Attorney, N. Scott Lilly, Second Assistant County Attorney, William P. O'Brien, Louisville/Jefferson County Metro Government, Director of Civil Division, Louisville, KY, Scott D. Bergthold, Law Office of Scott D. Bergthold, P.L.L.C., Chattanooga, TN, Counsel for Appellee.

Christopher S. Burnside, Griffin Terry Sumner, Frost Brown Todd LLC, Louisville, KY, Counsel for Amicus Curiae Reclaim Our Culture Kentuckiana, Inc.

Opinion of the Court by Justice SCHRODER.

This Court granted discretionary review of a Court of Appeals opinion adjudging that the Louisville/Jefferson County Metro Government's 2004 amendments to its code of ordinances, which placed numerous restrictions on adult entertainment businesses in the Metro area, were constitutional. Having considered the record and arguments of counsel, we adjudge that all of the restrictions, except for the blanket "no touch" provision, are constitutional. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## FACTS

Appellants represent two types of adult entertainment businesses which operate in the Louisville Metro area: live entertainment establishments that sell alcohol (with the exception of one business); and retail businesses that do not sell alcohol. On March 1, 2004, Appellee, the Louisville/Jefferson County Metro Government ("Metro"), enacted Ordinance 21, Series 2004, which amended Chapter 111 of its Code of Ordinances. The amendments pertained to adult entertainment businesses in the Louisville Metro area, and the stated purpose of the amendments was to combat the adverse secondary effects of sexually oriented adult entertainment businesses. Appellants objected to the following provisions in the amendments: the licensing scheme (owner/officer disclosure, licensing fees, criminal disability provision); the anti-nudity provisions; restrictions on the hours of operation; no direct tipping provision; prohibition on sales of alcohol; buffer zones between patrons and dancers; and a "no touch" provision.

Appellants filed suit in Jefferson Circuit Court on March 5, 2004, challenging the amendments to Chapter 111 on numerous state constitutional grounds. Thereafter, Metro removed the case to federal court and Appellants filed a motion to remand. The federal court granted Appellants' motion, deciding that it lacked jurisdiction under 28 U.S.C. § 1441 because Appellants did not make any claims under the federal Constitution.

The Jefferson Circuit Court granted summary judgment for Metro as to all the challenged provisions in the amendments except the requirement of disclosure of principal owners and the "no touch" provision, granting Appellants' motion for temporary injunction only as to enforcement of those two provisions. An appeal and a cross-appeal to the Court of Appeals followed.

On October 5, 2007, the Court of Appeals rendered its opinion wherein it upheld all of the challenged provisions, affirming the circuit court as to all the rulings adverse to Appellants and reversing on cross-appeal as to the two provisions construed in Appellants' favor. The case is now before us on Appellants' motion for discretionary review.

■ Because this case involves the construction and constitutionality of the ordinance at issue, our review of the case will be de novo. *Commonwealth v. Jameson,* 215 S.W.3d 9, 15 (Ky.2006), *cert. denied,* 552 U.S. 825, 128 S.Ct. 190, 169 L.Ed.2d 36 (2007). At the outset, we note that many of the issues in this case are controlled by *Jameson,* and *Restaurant Ventures LLC v. Lexington–Fayette Urban County Government,* 60 S.W.3d 572 (Ky.App.2001), two cases reviewing the constitutionality of local government ordinances regulating sex-

ually oriented adult entertainment businesses.

In *Jameson,* this Court provided a thorough analysis of the United States Supreme Court decisions in the area of regulating nude dancing and sexually oriented businesses, some of which were plurality opinions, up through the Court's decision in *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002). We have nothing to add to this analysis and are not inclined to depart from any of the reasoning or conclusions reached in *Jameson.* While state courts are free to expand individual rights beyond the federal floor, *see Commonwealth v. Wasson,* 842 S.W.2d 487, 492 (Ky.1992), we adjudge that on the issue of regulating sexually oriented businesses, the Kentucky Constitution does not grant broader protections than the federal Constitution, except for the blanket ban on touching as discussed below. Thus, we reject Appellants' urging that we adopt the Pennsylvania courts' expansive view on erotic expression in interpreting § 1 and § 8 of the Kentucky Constitution.

The amendments to Metro's ordinance herein implicate at least two protected categories of speech. First, there is the sexually explicit, but not obscene, speech associated with the retail businesses, such as adult books and videos. Secondly, there is the "symbolic speech" associated with the nude or semi-nude dancing at the live entertainment establishments. *See Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (wherein a plurality held that nude dancing was "expressive conduct within the outer perimeters of the First Amendment"). "[R]egulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment." *City of Renton v. Playtime Theatres, Inc.,* 475 U.S.

41, 46–47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). However, "content-neutral" time, place, and manner regulations which restrain speech will be upheld as constitutional if they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication. *Id.* at 47, 106 S.Ct. 925. If the regulations are content-based, they are subject to strict scrutiny. *City of Erie v. Pap's A.M.,* 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). If the regulations governing a sexually oriented business are unrelated to the suppression of expression, they are content-neutral and thus subject to the intermediate standard of scrutiny set forth in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). In *O'Brien,* the Court articulated the following four-part test for evaluating regulations affecting sexually oriented businesses:

[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377, 88 S.Ct. 1673.

In *Jameson,* this Court found that the restrictions (no nudity, no physical contact, and limited hours) on sexually oriented businesses were content-neutral because they were enacted to prevent the negative secondary effects of such businesses—increased crime, lowered property values, and sexually transmitted diseases. 215 S.W.3d at 28. In the present case, Metro enacted the amendments to the ordinance regulating sexually oriented businesses to combat the following secondary effects: adverse effects on nearby parks,

houses, and schools; urban blight; crime (including organized crime); prostitution; spread of sexually transmitted diseases; unsanitary conditions; public indecency; lewdness; loitering; illicit drug use and trafficking; negative impacts on property values; pornographic litter; sexual assault and exploitation; public indecency; obscenity; and noise. In addition, Metro cited to numerous reports and judicial opinions that have recognized or documented the adverse secondary effects of sexually oriented businesses.

## PROVISIONS GOVERNED BY JAMESON OR RESTAURANT VENTURES

■ The anti-nudity, six-foot buffer zone, 18–inch stage height, and limited hours of operation provisions in the ordinance are all provisions that were addressed and upheld in *Jameson* and/or *Restaurant Ventures.* The buffer zone and stage height provisions are identical to those in *Restaurant Ventures,* and the restrictions on hours of operation in Metro's ordinance (cannot operate from 1:00 am— 9:00 am) are more generous than those upheld in *Restaurant Ventures* (cannot be open from 1:00 a.m.-3:00 p.m.). 60 S.W.3d at 579–80. We decline to afford these restrictions any greater protection under the Kentucky Constitution than in *Jameson* and *Restaurant Ventures.*

## "NO TOUCH" PROVISION

■ Metro's "no touch" restriction provides: "It shall be a violation of this chapter for any employee, who regularly appears semi-nude in an adult entertainment establishment, to knowingly or intentionally touch a customer or the clothing of a customer." The trial court found that the restriction was unconstitutionally overbroad because it could be read to prohibit touching between an employee and a customer off the premises of the adult entertainment business and "otherwise legal and expressive touching such as a handshake between a patron and a dancer who is fully clothed and not performing at the time." The Court of Appeals upheld the restriction, rejecting the trial court's conclusion that the restriction could be read to apply to contact off the premises of the adult entertainment business. As for prohibiting otherwise legal and expressive touching in the establishment, the Court of Appeals held that such a ban is not constitutionally infirm because "touching between a performer and a customer is not protected expression." *See Hang On, Inc. v. City of Arlington,* 65 F.3d 1248, 1253–55 (5th Cir.1995).

In *Jameson* and *Restaurant Ventures,* provisions prohibiting physical contact between adult entertainment employees and customers were upheld. However, the language in the "no touch" provisions in those cases was limited to when the employee was performing. *Jameson, 215 S.W.3d at 11; Restaurant Ventures,* 60 S.W.3d at 580. In the present case, the prohibition on touching between an employee and patron has no such limitation. Clearly, Metro's "no touch" provision would be valid if it applied to employees only while they were performing or while still in a state of nudity. *See Hang On, Inc.,* 65 F.3d at 1251. "By placing a reasonable distance between the patrons and the performers, there is a decreased opportunity to solicit sex, contract social disease, and renders the no touch rule easier." *Restaurant Ventures,* 60 S.W.3d at 580 (addressing the buffer zone, stage requirement and no touch provisions as they relate to the distance between the patrons and performers while they are performing).

However, the question in this case is whether Metro's "no touch" provision is

overbroad because it would prohibit any intentional touching between an employee and patron, even if the performer is not performing or is fully clothed, and would prohibit even lawful touching of a nonsexual nature, such as a handshake. The Court of Appeals in *Restaurant Ventures* even questioned whether non-erotic touching could be prohibited:

> Appellants' argument that otherwise legal and expressive conduct, such as shaking hands or other non-erotic touching between people, could be prohibited under the ordinance is folly. The ordinance does not prohibit such social niceties (unless done while nude). The line between prohibited conduct and permitted conduct is clearly drawn by the ordinance.

*Id.* at 579. As recognized by the court in *Threesome Entertainment v. Strittmather*, wherein the court struck down a "no touch" provision:

> Thus, a semi-nude dancer could not even shake hands with a patron. A semi-nude dancer· also could not accept a glass of water from a co-employee if their hands touched in the exchange. And, ironically, under this Ordinance, a semi-nude dancer could not even push a customer away to rebuff an advance without subjecting herself to criminal charges.

4 F.Supp.2d 710, 722 n. 6 (N.D.Ohio 1998) (finding "no touch" provision overbroad because it did not contain a mens rea requirement). While the "no touch" provision in the present case does contain a mens rea, it would still prohibit benign, non-sexual, consensual, otherwise lawful touching between an employee and a customer, even when the employee is not performing or in a state of nudity.

▪ We do not agree with the Court of Appeals conclusion that all touching between a performer and a customer is not constitutionally protected. As noted above, touching during an erotic performance or while in a state of nudity is not protected expression. We would also agree that sexual touching would not be protected expression. However, we believe that nonsexual, consensual touching, such as a handshake or a pat on the back, as a greeting or show of fellowship, is a social custom and an integral part of our culture. This sort of touching is not based on any right of artistic expression, but on one's right to free association. Thus, it is afforded protection under § 1 and § 2 of the Kentucky Constitution as part of an individual's right to personal liberty. As this Court recognized in *Wasson:*

> The meaning of Sections One and Two as they apply to personal liberty is found in the remarks of J. Proctor Knott of Marion County (see Official Report of the Proceedings and Debates in the 1890 Convention, E. Polk Johnson, Vol. 1, p. 718):

> "[T]hose who exercise that power in organized society with any claim of justice, derive it from the people themselves. That with the whole of such power residing in the people, the people as a body rest under the highest of all moral obligations to protect each individual in the rights of life, liberty, and the pursuit of happiness, provided that he shall in no wise injure his neighbor in so doing."

842 S.W.2d at 494–95. The *Wasson* court goes on to quote from *Commonwealth v. Campbell,* 133 Ky. 50, 117 S.W. 383 (1909):

> Man in his natural state has the right to do whatever he chooses and has the power to do. When he becomes a member of organized society, under governmental regulation, he surrenders, of necessity, all of his natural right the exercise of which is, or may be, injurious to his fellow citizens. This is the price that he pays for governmental

protection, but it is not within the competency of a free government to invade the sanctity of the absolute rights of the citizen any further than the direct protection of society requires.... It is not within the competency of government to invade the privacy of a citizen's life and to regulate his conduct in matters in which he alone is concerned, or to prohibit him any liberty the exercise of which will not directly injure society.

*Wasson,* 842 S.W.2d at 494–95 (quoting *Campbell,* 117 S.W. at 385).

We recognize that our nation's highest Court has rejected the notion of any right of "free association," unless it is the context of free speech or an intimate human relationship. *See City of Dallas v. Stanglin,* 490 U.S. 19, 23–25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989); *Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Nevertheless, we deem such a right exists in the Commonwealth under our state Constitution. However, we acknowledge this right is not absolute. Hence, we must apply the test of *O'Brien* to assess whether Metro's blanket "no touch" provision is sufficiently justified to combat the secondary effects of sexually oriented businesses.

There is no question that the first three parts of the *O'Brien* test have been met. As with the other restrictions we have upheld herein, Metro had the authority to enact the ordinance, there existed a substantial governmental interest in regulating sexually oriented businesses, and the provision was aimed at curbing the secondary effects of sexually oriented businesses, not the suppression of speech.

As for the fourth part of the test—whether the "no touch" provision would incidentally burden the protected conduct more than is necessary to further the governmental interest—we believe that the wording of the provision goes overboard in forbidding lawful, nonsexual, consensual touching. In regulating speech, an ordinance

must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.

*DLS, Inc. v. City of Chattanooga,* 107 F.3d 403, 412 (6th Cir.1997) (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 798–99, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)) (internal citations and quotation omitted). Metro maintains that the "no touch" provision is necessary to combat prostitution and sexually transmitted disease. Although Metro has a valid interest in trying to stifle these negative secondary effects, we believe that prohibiting all touching, including benign, nonsexual touching, is substantially broader than necessary to achieve Metro's interest. The nonsexual touching that is common in our culture as a means of social greeting or as an expression of platonic affection does not always lead to sexual behavior, and we will not

cynically presume otherwise. An ordinance could easily be more narrowly tailored to prohibit sexual touching, as in the ban on touching during a performance or while in a state of nudity. Further, there exist laws in the Commonwealth which criminalize unwanted sexual contact. *See* KRS 510.130. Accordingly, we adjudge that the "no touch" provision in this case is unconstitutionally overbroad.

### DIRECT TIPPING PROVISION

▬▬▬ Appellants also take issue with the following provision in the ordinance which prohibits directly tipping the entertainers:

> It shall be a violation of this chapter for any employee, while semi-nude in an adult business, to knowingly or intentionally receive any pay or gratuity directly from any patron or customer or for any patron or customer to knowingly or intentionally pay or give any gratuity directly to any employee, while said employee is semi nude in an adult entertainment establishment.

The no-direct-tipping provision is intended to work in conjunction with the staging requirement and proximity limit to reduce the secondary effects associated with the adult entertainment—prostitution, sexually transmitted diseases, and drug transactions. Indeed, it would defeat the purpose of the buffer zone or a valid "no touch" provision if patrons were allowed to directly tip performers during their performances. Thus, the provision clearly meets the first three parts of the *O'Brien* test.

Appellants argue that tips are such an important part of the adult performance, that the ban on direct tipping imposes a financial disincentive which discourages participation in the protected speech. Thus, Appellants contend that the provision is unduly burdensome.

While we recognize that money is "a necessary and integral part of many, perhaps most, forms of communication[,]" *Buckley v. Valeo*, 424 U.S. 1, 65, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the restriction here does not deprive the performer of the ability to earn tips. The restriction merely disallows direct tips when the performer is in a state of semi-nudity. Tips could still be earned via a tip jar placed at the edge of the six-foot buffer zone. Further, in light of our ruling above on the "no touch" provision, tips could be given to the performer after the performance if the performer is no longer in a state of semi-nudity. Hence, the restriction allows for reasonable alternative avenues of receiving compensation for the performance, while furthering Metro's interest in reducing negative secondary effects. *See City of Renton*, 475 U.S. at 53, 106 S.Ct. 925.

### PROHIBITION ON SALE OF ALCOHOL

▬▬▬ The ordinance also contains a provision prohibiting the sale of alcoholic beverages by any adult entertainment establishment and prohibiting an adult entertainment establishment from applying for a license to sell alcoholic beverages. Appellants argue that the ban on selling alcohol is unconstitutional as a violation of § 61 of the Kentucky Constitution and the Twenty-first Amendment to the United States Constitution, and is preempted by state legislation.

The Twenty-first Amendment to the United States Constitution, which repealed prohibition, gives the states power to regulate the sale of alcohol within their borders. § 61 of the Kentucky Constitution provides for local governments to hold elections to determine if alcohol shall be sold and the sale thereof regulated within its borders. Appellants maintain that Metro's prohibition on selling alcohol vio-

lates both constitutional provisions because it was enacted without voter approval and because the state has not otherwise delegated to the local government the authority to impose alcohol prohibitions.

As for the Twenty-first Amendment claim, the United States Supreme Court could not have been more clear in *City of Newport, Ky. v. Iacobucci,* when it recognized the state's broad power to regulate alcohol, and that the state could "delegate this power as they see fit." 479 U.S. 92, 95–96, 107 S.Ct. 383, 93 L.Ed.2d 334 (1986). The appellee argued, as Appellants do in the present case, that, because the Kentucky Constitution allows for local elections on the issue of whether alcohol could be sold within the locale's borders, the Twenty-first Amendment is violated when a local government seeks to prohibit or regulate alcohol without such an election. Without reaching the state law question of the propriety of the delegation of authority from the state to the City of Newport, the Supreme Court adjudged that *New York State Liquor Authority v. Bellanca,* 452 U.S. 714, 101 S.Ct. 2599, 69 L.Ed.2d 357 (1981) (holding that state could prohibit topless dancing in bars), was controlling and thus concluded that the local government's ordinance banning nude dancing in bars that sold liquor did not violate the Twenty-first Amendment. *Iacobucci,* 479 U.S. at 94–96, 107 S.Ct. 383. In *Bellanca,* the Court stated:

> This Court has long recognized that a State has absolute power under the Twenty-first Amendment to prohibit totally the sale of liquor within its boundaries. It is equally well established that a State has broad power under the Twenty-first Amendment to regulate the times, places, and circumstances under which liquor may be sold.

452 U.S. at 715, 101 S.Ct. 2599 (citations omitted). Hence, the question of the alleged violation of the Twenty-first Amendment has been put to rest. We now turn to the claims regarding § 61 of the Kentucky Constitution and preemption.

Pursuant to § 61, the Legislature has set up means and methods of holding a local option election. KRS 242.020 et seq. KRS 241.030 and 241.060 established the Alcohol Beverage Control Board to promulgate reasonable administrative regulations governing the sale and distribution of alcohol in the state. "Under its police powers [regarding the regulation of the sale of alcohol] the Legislature may provide for supplementation of measures purely local, and grant to a local subdivision such rights as it may deem best as ways and means of exercising local police power." *Fuson v. Howard,* 305 Ky. 843, 205 S.W.2d 1018, 1020 (1947). Pursuant to this delegation of its police power, KRS 241.220 provides for the appointment of an urban-county administrator whose functions are set out in KRS 241.250 as follows:

> The functions of each urban-county administrator shall be the same with respect to urban-county licenses and regulations as the functions of the [Alcohol Beverage Control] board with respect to state licenses and regulations, except that no regulation adopted by an urban-county administrator may be less stringent than the statutes relating to alcoholic beverage control or than the regulations of the board.

In *City of Louisville v. Michael A. Woods, Inc.,* the city of Louisville enacted an ordinance forbidding nude or nearly nude activities on premises licensed by the Alcoholic Beverage Control Board. 883 S.W.2d 881 (Ky.App.1993). The opponents of the ordinance argued that the ordinance was in conflict with the statutory scheme regarding the regulation of the sale of alcohol and thus usurped the state's power to so regulate the sale of alcohol. *Id.* at

884. The Court of Appeals rejected this argument and upheld the ordinance, reasoning:

> The statutes concerning alcoholic beverages seem to not only give cities the opportunity to regulate conduct in such establishments, but require that standards be maintained. The ABC Board has acknowledged that different cities will have different standards, and the Board's regulations were to present at least some minimum standards. We find no prohibition against a city invoking stricter standards of conduct in places serving alcoholic beverages.

*Id.* at 883.

As the United States Supreme Court noted in *Bellanca,* "[c]ommon sense indicates that any form of nudity coupled with alcohol in a public place begets undesirable behavior." 452 U.S. at 718, 101 S.Ct. 2599. And in *Ben's Bar, Inc. v. Village of Somerset,* in rejecting a First Amendment challenge to a ban on the sale of alcohol in an adult-oriented business, the court recognized that "[p]rohibiting alcohol on the premises of adult entertainment establishments will unquestionably reduce the enhanced secondary effects resulting from the explosive combination of alcohol consumption and nude or semi-nude dancing." 316 F.3d 702, 727–28 (7th Cir.2003).

In the instant case, the ban on the sale of alcohol in adult entertainment establishments was not more lenient than any of the statutes regulating alcohol. *See* KRS Ch. 241–244. Thus we hold that Metro's ordinance prohibiting the sale of alcohol in adult entertainment businesses was a proper exercise of its police power to regulate the sale of alcohol, as well as the conduct in adult entertainment businesses.

As to the argument that the alcohol provision was preempted by state legislation, we would note that a preemption argument was also made in *Restaurant Ventures,* regarding the restriction on the hours of operation. 60 S.W.3d at 580–81. In rejecting the assertion that the ordinance was preempted by KRS 244.295 (setting the hours of operation for alcoholic beverage licensees), this Court adjudged that "[t]he regulation of operating hours of adult entertainment establishments is a valid exercise of the government's power to regulate those establishments. The ordinance regulates the operating hours not because they sell alcoholic beverages, but because of the sexually-oriented nature of the entertainment provided." *Id.* at 581. In sum, we find there was no preemption by state legislation or violation of § 61 of the Kentucky Constitution and uphold the ban on the sale of alcohol in the ordinance.

### LICENSING PROVISIONS

#### 1. Licensing Fees

 Metro's ordinance requires adult entertainment establishments to pay $1,000 a year for a license to do business, and employees must pay $25 a year for a license to work in those establishments. Appellants argue that the cost of those licenses operates as a prior restraint on their right to operate and work in an adult entertainment establishment. "A 'prior restraint' exists when speech is conditioned upon the prior approval of public officials." *Nightclubs, Inc. v. City of Paducah,* 202 F.3d 884, 889 (6th Cir.2000), *overruled on other grounds by 729, Inc. v. Kenton County Fiscal Court,* 515 F.3d 485 (6th Cir.2008) (quoting *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975)).

The United States Supreme Court has decided three cases that relate to charging fees to engage in protected expression: *Cox v. New Hampshire,* 312 U.S. 569, 576–77, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); *Murdock v. Pennsylvania,* 319 U.S. 105,

114, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); and *Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). Those cases essentially looked at the following three factors in determining whether a license fee is an improper restraint on free speech:

> (1) whether the fee's maximum amount will deter the exercise of First Amendment rights, (2) whether the measures the cost of which the County seeks to transfer to licensees via its fee structures are narrowly tailored means of advancing the County's interest in curbing secondary effects, and (3) whether the County's cost estimates for those measures are reasonable.

*729, Inc.,* 515 F.3d at 501. The Sixth Circuit in *729, Inc.,* "distilled two general principles from *Cox, Murdock, and Forsyth County* [:]"

> First, an ordinance requiring a person to pay a license or permit fee before he can engage in a constitutionally protected activity does not violate the Constitution so long as the purpose of charging the fee is limited to defraying expenses occurred [sic] in furtherance of a legitimate state interest. In other words, in order to transfer the cost of a government measure to a licensee, the measure itself must be legitimate. Thus, the measure must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication. Second, [there must be] some limit on the amount the government could charge, based on the potential for a fee to deter protected speech.

515 F.3d at 502–03 (quotations and citations omitted).

Metro presented evidence of funds it would expect to spend on law enforcement, background checks, and license application processing, which would exceed projected revenue generated by the license fees. In *Bright Lights, Inc. v. City of Newport,* the court found that "because Newport's licensing fees combat undesirable effects such as prostitution, the fees address an overriding government interest." 830 F.Supp. 378, 386 (E.D.Ky.1993) (internal quotation and citation omitted). Likewise, the fees in the case at bar were shown to be related to legitimate costs associated with adult entertainment businesses.

As to the amount of the fees, licensing fees of $250 and $5,000 have been upheld in Kentucky for adult entertainment businesses. *Bright Lights, Inc.,* 830 F.Supp. at 386 ($5,000 licensing fee upheld); *Mr. B's Bar and Lounge, Inc. v. City of Louisville,* 630 S.W.2d 564, 568 (Ky.App.1981) ($250 licensing fee upheld as constitutional as a matter of law); *but cf., 729, Inc.,* 515 F.3d at 503–04 (remanding on issue of $3,000 licensing fee to determine whether amount narrowly tailored to serve a significant governmental interest). Given the evidence proffered by Metro regarding the costs of dealing with adult entertainment businesses and their secondary effects, we deem the licensing fees to be constitutionally valid.

**2. Criminal Disability Provision**

■ Another provision in the ordinance states that an adult entertainment license is to be denied if the applicant has been convicted of a specified crime, including rape, sexual misconduct, indecent exposure, falsifying business records, prostitution, obscenity, engaging in organized crime, and certain drug offenses. Appellants argue that the provision operates as a prior restraint on free speech and is therefore unconstitutional.

The trial court found that the Appellants lacked standing to challenge the provision because there was nothing in the record

indicating that any of the them had been convicted of any of the specified crimes. The Court of Appeals agreed, citing *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), which is precisely on point.

In *FW/PBS, Inc.,* which involved a similar criminal disability provision in an ordinance regulating sexually oriented businesses, there was nothing in the record indicating that any of the parties had been convicted of one of the specified crimes. *Id.* at 233–35, 110 S.Ct. 596. "To establish standing to challenge that provision the individual must show both (1) a conviction of one or more of the enumerated crimes, and (2) that the conviction or release from confinement occurred recently enough to disable the applicant under the ordinance." *Id.* at 234, 110 S.Ct. 596. Because there is nothing in the record in the instant case demonstrating that Appellants have been convicted of any of the specified crimes, the lower court and Court of Appeals properly found they did not have standing to challenge the criminal disability provision.

### 3. Principal Disclosure Provision

The ordinance requires that an application for an adult entertainment license contain the name, address, date of birth, and a copy of a government-issued photo identification card or a set of fingerprints of all principal owners, if the applicant is an individual. If the applicant is other than an individual, such as a corporation or partnership, each officer, director, general partner, principal owner, and each other person who will participate directly in decisions relating to the management of the business shall provide the above-listed information. A principal owner is defined in the ordinance as any person owning, directly or beneficially, twenty percent or more of the business.

Appellants argued that the disclosure requirement for corporate shareholders owning only twenty percent of an adult-oriented business is a prior restraint on free speech, as well as a violation of their fundamental right to privacy. Although the trial court acknowledged that government has a legitimate interest in knowing the identity of those individuals who have direct legal responsibility for the operations of adult oriented businesses, the court determined that the disclosure requirement for those owning only a twenty percent interest in the business was overbroad and, thus, did not meet the fourth prong of the *O'Brien* test. The trial court reasoned that "[a] twenty percent or less shareholder would normally have little, if any, responsibility for the everyday operations of the business, and twenty percent is generally not a controlling or significant share in the business." The Court of Appeals reversed the lower court's ruling, finding that the requirement of disclosure of twenty percent shareholders furthered Metro's interest in combating organized crime associated with the adult entertainment industry, which was one of the stated purposes of the ordinance.

The United States Supreme Court has recognized that compelled disclosure, in itself, can have a chilling effect and seriously infringe on one's right to free speech guaranteed by the First Amendment. *Buckley,* 424 U.S. at 64, 96 S.Ct. 612 (1976). However, the right to anonymously exercise one's right to free speech is not absolute. A disclosure requirement will be upheld if the countervailing state interests in the information sought is shown to further a substantial government interest. *Id.* This requires a "relevant correlation" or "substantial relation" between the information required and the government interest. *Id.* Here, Metro maintains they are entitled to disclosure of the infor-

mation regarding twenty percent or more shareholders and those involved in the day-to-day operation of the business to further their interest in combating the crime, in particular organized crime, associated with adult oriented businesses.

In *Envy, Ltd. v. City of Louisville*, a similar disclosure provision was upheld in a prior ordinance enacted by the City of Louisville regulating adult entertainment establishments. 734 F.Supp. 785 (W.D.Ky. 1990). In that case, the more detailed personal information (name, address, date of birth, social security number and photograph of applicant) was required of majority shareholders and those involved in the day-to-day operations of the business, while only basic information (name and address) was required of all officers and directors. *Id.* at 787–89. The court found that evidence of the extensive involvement of organized crime in adult entertainment activities necessitated disclosure of the true owners of these establishments to aid in enforcement of criminal laws, public and safety regulations, and income tax laws. *Id.* at 790. Hence, the court held that the disclosure requirement was rationally related to and furthered the government's substantial interest in reducing the secondary effects resulting from adult entertainment businesses. *Id.*

The question before us is whether the disclosure requirement for only twenty percent shareholders is overbroad. In *Tee & Bee, Inc. v. City of West Allis*, 936 F.Supp. 1479 (E.D.Wis.1996), a disclosure requirement for ten percent or more shareholders in adult oriented businesses was held to be constitutional, and in *Dumas v. City of Dallas*, 648 F.Supp. 1061 (N.D.Tex.1986), *reversed in part on other grounds sub nom. FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), a disclosure requirement for twenty percent or more share-

holders was upheld. *But see East Brooks Books, Inc. v. City of Memphis*, 48 F.3d 220, 226 (6th Cir.1995) (disclosure requirement for any shareholder held to be impermissibly broad). The controlling principle in these cases appears to be "the setting of a minimum level of interest in the adult-oriented establishment in order to ensure that an individual shareholder is not subjected to regulation when he or she possesses a mere *de minimus* interest." *Tee & Bee, Inc.*, 936 F.Supp. at 1488; *see also East Brooks Books, Inc.*, 48 F.3d at 226.

As to Metro's disclosure requirement in the present case, in view of the minimum level of a twenty percent interest and the government's interest in curbing organized crime, which can be difficult even when there are no unknowns, we believe the disclosure provision is not overbroad. Accordingly, the disclosure provision is constitutional.

### *STANDING*

**1. Vagueness Claims**

■ Appellants argued that various definitions in the ordinance relating to what constitutes an "adult entertainment establishment" (e.g., "commercial sexual entertainment center," "regular commercial participation," "principal use") were unconstitutionally vague. The trial court ruled that Appellants lacked standing to challenge the definitions under the vagueness doctrine because Appellants admittedly qualified as adult entertainment establishments. The Court of Appeals agreed.

■ The general rule is that a party who engages in conduct that is clearly proscribed cannot maintain a claim for vagueness as to that law. *United States v. Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). Here, Ap-

pellants' general characterization or description of their own businesses falls squarely within the listed definitions of "adult entertainment activity" or "adult entertainment establishment" in the ordinance. While one of the Appellants alleges that certain conduct of two of its entertainers may not fall within those definitions, it does not deny that other activities in the establishment would qualify it to fall within the definition of an "adult entertainment establishment." Accordingly, Appellants do not have standing to assert a vagueness challenge.

## 2. Minors

 Appellants argue before us, as they did at the Court of Appeals, that they have standing to challenge the provision in the ordinance which prohibits them from employing minors or allowing minors to enter the premises of an adult entertainment establishment because of the criminal penalties Appellants would be subject to if they (Appellants) violated this provision. This issue was not argued before the trial court. Rather, they argued before the trial court that the provision violated the **minors'** fundamental right to enter such establishments. This is a completely different argument. It is well-settled that parties cannot argue one thing before the trial court and another to the appellate court. *See Kennedy v. Commonwealth,* 544 S.W.2d 219, 222 (Ky.1976). Accordingly, the issue is not properly before us.

### *DISCOVERY*

 Appellants' primary argument is that the trial court erred in failing to allow them to factually litigate their challenges to Metro's claims of the adverse secondary effects of sexually oriented businesses. The voluminous record in this case, which contains abundant evidence submitted by all parties regarding the issue of second-

ary effects, belies Appellants' assertion. Appellants were given ample opportunity to complete discovery. *See Pendleton Bros. Vending, Inc. v. Commonwealth Finance and Admin. Cabinet,* 758 S.W.2d 24, 29 (Ky.1988). As to Appellants' claim regarding the dispute over Metro's composite reply brief and Appellants' exhibits in support of supplemental brief, it is well-settled that a trial court has broad discretion in resolving disputes in the discovery process, and we will not disturb a discovery ruling absent an abuse of that discretion. *Sexton v. Bates,* 41 S.W.3d 452, 455 (Ky.App.2001). We find nothing in the trial court's handling of discovery in this case which amounts to an abuse of discretion.

### *COMPLETENESS OF CIRCUIT COURT RULING*

Appellants maintain that the trial court failed to address several issues they raised. We would remind Appellants that the order was a summary judgment order, and pursuant to CR 52.01, specific findings and conclusions of law are not required with summary judgments. *See Wilson v. Southward Inv. Co. No. 1,* 675 S.W.2d 10 (Ky.App.1984).

 Summary judgment is proper if the record, when examined in its entirety, shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03. "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.,* 807 S.W.2d 476, 480 (Ky.1991). In reviewing Appellants' remaining claims, we adjudge there were no genuine issues of material fact, and Metro was entitled to judgment as a matter of law. Accordingly, the trial court properly

entered summary judgment in favor of Metro.

### CONCLUSION

For the reasons stated above, the judgment of the Jefferson Circuit Court is affirmed in part, reversed in part and remanded for proceedings consistent with this opinion.

All sitting. All concur.

VENTERS, J., concurs by separate opinion in which ABRAMSON and CUNNINGHAM, JJ., join.

VENTERS, J., CONCURRING:

While I am in full agreement with the conclusions reached by the well-reasoned majority opinion, I write separately to more fully address the provision exclusively relied upon by Appellants in support of their constitutional claims, Section 1(4) of the Kentucky Constitution. Appellants make no federal First Amendment claims, and seek only to have their arguments addressed on state constitutional grounds.[1] Indeed, the Federal District Court, following removal by Metro, dismissed this very litigation from its docket for lack of jurisdiction on the basis that Appellants raised no federal constitutional claims.

Despite Appellants' disclaimer of their federally-protected constitutional rights, the majority bases its analysis of Section 1(4) of the Kentucky Constitution on federal cases decided under the United States Constitution or on other Kentucky decisions, such as *Commonwealth v. Jameson,* 215 S.W.3d 9 (Ky.2006) and *Restaurant Ventures, LLC v. Lexington–Fayette Urban County Government,* 60 S.W.3d 572 (Ky.App.2001) which rest on federal authority because, unlike the case now before us, First Amendment rights, as well as Section 1(4) rights were involved. Usually, those appearing in state courts asserting claims of fundamental constitutional liberties invoke the applicable sections of both federal and state constitutions, taking advantage of whichever proves to be more advantageous. Here, our analysis need not be tethered to a contemporaneous assertion of federal rights.

I appreciate the recognition of this point by the Court of Appeals in its lengthy opinion in this matter, and its attempt to ascertain the scope and breadth of Section 1(4) from Kentucky's own jurisprudential experience. That attempt was not especially fruitful, because as the Court of Appeals found, Kentucky's highest courts have rarely undertaken such analysis. Instead, we have rather consistently chosen to tie our interpretation of the Kentucky Constitution to the ebb and flow of federal constitutional analysis. I see no reason why our interpretation of the Kentucky Constitution is dependent to any degree whatsoever on the federal courts' analysis of the federal constitution. We may, of course, be persuasively informed by their view of analogous provisions, just as we are routinely informed by the decisions of the courts of our sister states, but we should not accept the federal interpretation of federal law as controlling in our interpretation of state law. Indeed, the United States Supreme Court has so held, stating in *Minnesota v. National Tea Co.,* 309 U.S. 551, 557, 60 S.Ct. 676, 84 L.Ed. 920 (1940):

1. The Appellants appear to pursue this strategy because the Commonwealth of Pennsylvania has a constitutional provision closely mirroring our Section 1(4) (See Pennsylvania Constitution, Article I, § 7), and the Pennsylvania courts have interpreted their provision to provide greater rights in the area of nude dancing than does the federal constitution. *See Pap's A.M. v. City of Erie,* 571 Pa. 375, 812 A.2d 591 (2002).

It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions ... [S]tate courts will not be the final arbiters of important issues under the federal constitution; and that we will not encroach on the constitutional jurisdiction of the states. This is not a mere technical rule nor a rule for our convenience. It touches the division of authority between state courts and this Court and is of equal importance to each. Only by such explicitness can the highest courts of the states and this Court keep within the bounds of their respective jurisdictions.

This Court is the final arbiter of the Kentucky Constitution, and our interpretation of its terms is not constrained by the words of used in the federal Constitution any more than it is by the Pennsylvania Constitution. Of course we recognize the United States Constitution as the supreme law of the land. We respectfully yield to the authority of the federal courts to interpret the federal Constitution, as we retain exclusive authority to interpret our own.

It has been suggested in this matter that while we are free to interpret state constitutional provisions more broadly than similar provisions of the federal Constitution, we may not conclude that our state constitution offers a lesser degree of protection than the federal. This Court itself has so stated, erroneously as dicta I believe, in *Commonwealth v. Wasson,* 842 S.W.2d 487, 492 (Ky.1992) (stating "We are not bound by decisions of the United States Supreme Court when deciding whether a state statute impermissibly infringes upon individual rights guaranteed in the State Constitution so long as state constitutional protection does not fall below the federal floor, meaning the minimum guarantee of individual rights under the United States Constitution as inter-preted by the United States Supreme Court.") *See also Elk Horn Coal Corp. v. Cheyenne Resources, Inc.,* 163 S.W.3d 408, 418 (Ky.2005). The statement is, however, a misreading of the opinion of the United States Supreme Court decision in *Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). In *Hass,* the Oregon courts addressed search and seizure issues predicated on the Fourth Amendment of the federal Constitution, *not* the Oregon Constitution, and the United States Supreme Court simply stated the obvious, that a "state may not impose such greater restrictions *as a matter of federal constitutional law* when this Court specifically refrains from imposing them." *Id.* (emphasis added.) The *Hass* decision says nothing that fetters the authority of a state's highest court to interpret *state constitutional rights* either more restrictively or less restrictively than the federal constitutional counterpart.

Therefore, addressing the issues presented without regard to the First Amendment interpretations relied upon by the majority, I conclude that the constitutional protections contained in Section 1(4) of our constitution do not extend to nude dancing, and thus the Metro ordinances proscribing this conduct do not violate its provisions. I would accordingly uphold the Metro ordinances at issue as constitutional under Section 1(4), with the exception of the no-touch provision, which I likewise conclude is overbroad under our state constitutional jurisprudence.

Section 1(4) of the Kentucky Constitution provides as follows: "All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned: ... Fourth: The right of freely communicating their thoughts and opinions." This language has been included in each of our four constitutions. In our 1792 Constitution

the language was contained in Article XII, § 7, and was combined with other language addressing free speech liberties:

> The printing presses shall be free to every person who undertakes to examine the proceedings of the Legislature or any branch of Government; and no law shall ever be made to restrain the right thereof; *the free communication of thoughts and opinions is one of the invaluable rights of man,* and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.
>
> (emphasis added).

This same language was carried forward in our 1799 Constitution in Article X, § 7, and in Article XIII, § 9, of our 1850 Constitution. In our 1891 Constitution, the Section 1(4) language was codified in Section I of our Bill or Rights, and the remaining language was incorporated separately into Section 8. The carving out of the Section 1(4) language for separate inclusion in Section I of the Bill of Rights was presumably to emphasize the importance of the liberty interest granted under the provision.

Section 1(4) was presented at the 1890 Constitutional Convention by Mr. Robert Rodes in association with the remaining six provisions contained in the present Section 1 of our Bill of Rights. After presenting the seven provisions of Section 1 of our Bill of Rights, Mr. Rodes continued as follows:

> There you have a general statement of our rights, the seven different subdivisions specifying in what those rights are, and they are taken not only from your Constitution, but from those great symbols of freedom I referred to a moment ago, the Declaration of Independence [the preamble to the bill of rights is taken from the Declaration of Independence] and the Constitution of Virginia

of 1776. Do you wish to abolish them? Will any man be prepared to say they are not so? Will you drive them out of your Constitution? The fact that he has advanced these seven distinct propositions into the front column, abreast with this main idea, this central proposition of the whole Bill of Rights, certainly ought not to be attributed to any weakness in them; on the contrary, we know very well that while the light, shining on the earth, is mere white light, when concentrated on any object it makes a photograph. This presents a picture here. A picture of what? A picture of free men with certain inalienable and indefeasible rights which can not be taken away; and you see them a living picture before you, and I ask you, and I ask you as a matter of taste, will you drive that out, expel it from the Constitution. I apprehend you will not.

1 1890 Kentucky Constitutional Convention Debates, 435–436.

By characterizing the seven provisions contained in Section I of our Bill of Rights as "A picture of free men with certain inalienable and indefeasible rights which can not be taken away," it is difficult to conceive that the framers reckoned in this picture the right of nude dancing. I do not believe such conduct may properly be characterized as an "inalienable and indefeasible" right. Thus, I believe that the original intent of Section 1(4) was directed to a higher order of expression of thought and opinion, and that the boundaries of the provision do not encompass nude dancing.

There is no question that dancing itself is a recognized form of expressing thoughts and opinions. *Restaurant Ventures,* 60 S.W.3d at 576 ("The ancient Greeks used dance as a means of communication; Indian tribal dances are a means of communicating within the tribes as well as for spiritual communication; and ballet

and other artistic forms of movement communicate ideas to the audiences."). Beyond any doubt Section 1(4) protects the expression of thoughts and opinions communicated in forms of dancing of this character. However, I agree with the observation made in the *Restaurant Ventures* decision that it is difficult to discern the idea that erotic dancing alone is intended to convey. "Mere nude dancing without intent to make a statement, political, social, or otherwise, would seem to be merely for the purpose of sexually arousing the viewer." *Id.* Being of this view, I do not believe nude dancing communicates a thought or opinion so as to come within the protection of Section 1(4).

Moreover, public nudity has always been subject to state regulation, and indecent exposure was a criminal offense under common law. *Case v. Commonwealth,* 313 Ky. 374, 231 S.W.2d 86 (1950). *See also Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 573, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (Scalia, J., concurring) ("Public indecency—including public nudity—has long been an offense at common law. *See* 50 Am. Jur.2d, Lewdness, Indecency, and Obscenity 449, 472–474 (1970)."). Public nudity is criminalized under the penal code under the statutes proscribing indecent exposure. KRS 510.148 (first-degree indecent exposure); KRS 510.150 (second-degree indecent exposure). An exception is made for nudist societies, but those groups are extensively regulated. *See* KRS Chapter 232. Mere nudity has never been deemed under our constitution to be expressive of any thought or opinion. It is therefore not constitutionally protected under Section 1(4), and the state and its municipal corporations have broad authority to regulate it under the Kentucky Constitution.

Accordingly, I concur with the majority in upholding the Metro ordinances, excepting the no-touching provision, as constitu-

tional under our state constitution for the reasons stated above.

ABRAMSON and CUNNINGHAM, JJ., join.